FRATERNAL ORDER OF POLICE YOUNGSTOWN LODGE NO. 28 ET AL., APPELLEES, *v.* HUNTER, MAYOR, ET AL., APPELLANTS.

(No. 73 C. A. 24—Decided April 16, 1975.)

Messrs. *Green, Schiavoni, Murphy & Haines,* for appellees.

Mr. *William J. Higgins,* Mr. *Joseph E. Vouros* and Mr. *Donald DeSalvo,* for appellant.

DONOFRIO, J. This is an appeal by the defendants, Jack C. Hunter, Mayor, city of Youngstown, and the Youngs-

town Civil Service Commission, hereinafter referred to as appellants.

Appellee Carmen Agnone, a maintenance employee of the Youngstown Municipal Airport in the classified service of the city of Youngstown, and the Fraternal Order of Police, Lodge No. 28, filed a complaint seeking to have the court declare the rights of civil service employees with regard to Rule IV, Section 9(F), of the Youngstown Civil Service Commission; asking the court to issue a temporary restraining order against those who would terminate the employment of any employee who failed to execute an affidavit regarding his residence; and, for a second cause of action, praying for a declaratory judgment as to appellees' rights and duties as to residency under the applicable laws of the state and rules and regulations of the Youngstown Civil Service Commission; and for a finding and declaratory judgment that the rule of a Civil Service Commission requiring residency of a tenured Civil Service employee is invalid.

After a hearing on the temporary restraining order, such was granted, and on April 11, 1973, the matter was brought to trial before the court.

The rule at issue, which was adopted January 20, 1972, provides as follows:

"Any officer or employee not residing within the city limits of Youngstown, except as otherwise provided in Rule IV, Section 5, is subject to dismissal from service of the city."

The trial court found that there being no rule as to residency prior to January 20, 1972, those employees of the city of Youngstown who entered the classified service prior to January 20, 1972, were not required by the rule of the Youngstown Civil Service Commission to maintain residency in the city of Youngstown; therefore, such rule was not enforceable against any employee entering the classified service prior to January 20, 1972.

The court also found that the rule was unconstitutional and void for the reason that it was retroactive in its operation, and further that the constitutionality of the rule

depended on whether or not it was a reasonable rule, and that any regulation which serves to restrict the exercise of a constitutional right of freedom of movement across frontiers, unless shown to promote a compelling governmental interest, is unconstitutional. The court found that the defendants did not produce any evidence of any kind from which the court could determine the reasonableness of the rule, and that since no evidence was produced to support the reasonableness of the rule, the court said that the burden of the defendants was not sustained in showing the compelling governmental interest that required a classified employee to be a resident of the city of Youngstown as opposed to his right to exercise his choice of a place to live. The court found, in the absence of any evidence, that under the constitution of the United States the rule attempting to be enforced was an unconstitutional interference with the rights of employees. It found Rule IV, Section 9(F), of the Civil Service Commission to be unconstitutional and void for the following reasons:

"1. It is retroactive in its operation.

"2. It is unreasonable because it violates the rights of the individual guaranteed by the Fifth Amendment of the Constitution of the United States."

It is from this holding and order of the trial court that appellants bring this appeal.

Appellants assign five errors, the first of which states as follows:

"The trial court erred in finding that Section 733.68, Ohio Revised Code, does not apply to a police officer."

R. C. 733.68, states, in pertinent part:

"* * * [E]ach officer of a municipal corporation * * * shall be an elector of the municipal corporation * * *."

At the trial below, the appellants argued that a police officer was an officer of the municipal corporation, and, therefore, must be an elector of that municipal corporation. The court was correct in rejecting the appellants' argument.

An examination of R. C. 733.68 indicates that the term "officer" as used in that section denotes elected officials

and appointees other than police officers. In *State* v. *Byomin* (1958), 106 Ohio App. 393, the court, regarding R. C. 733.68, stated at page 397 as follows:

"We do not believe this section applies to police officers of a village or to a deputy marshal. The officer designated in this section refers to others than police officers * * *."

We find no error in the court's ruling regarding appellants' first assignment of error, and this assignment of error is, therefore, overruled.

Appellants' second assignment of error states as follows:

"The trial court erred in its finding that Youngstown Revised Code of Ordinances, Section 32.04 has no application to the issue at Bar notwithstanding its former decision in *Kissos et al.* v. *City of Youngstown, et al.*"

The thrust of appellants' second assignment of error is that the court erred in the instant case in construing Youngstown Revised Code of Ordinances Section 32.04 as being in conflict with the rules of the Civil Service Commission of the city of Youngstown. Further, appellants' contention is that the Youngstown City Council has the power and authority to require residency as a condition of employment and provide dismissal for the failure to comply with residency requirements. This question was previously adjudicated by the trial court in another case known as *Kissos et al.* v. *City of Youngstown,* Mahoning County Common Pleas Court Case No. 195308. In the *Kissos* case and the instant case, the court's reasoning as to the city ordinance conflicting with the civil service rule and its authorities for such reasoning are as follows: The lower court held that the Youngstown City Charter precludes City Council from prescribing qualifications for employment and grounds for termination of employment.

Section 52 of the Youngstown Charter provides in pertinent part as follows:

"All of the provisions of the Revised Code of the State of Ohio relating to Municipal Civil Service are hereby adopted and made a part of this Charter * * *."

The citizenry of Youngstown, by approving that provision, expressed a desire to adopt the state civil service laws. It is well-settled that when a municipal charter adopts by general reference the state laws on any subject, the laws become a part of the charter.

In *Reed* v. *City of Youngstown* (1962), 173 Ohio St. 265, the syllabus states as follows:

. "1. Because of section 52 of the Youngstown charter, the general statutes of the state relating to municipal civil service, as existing at any particular time, represent a part of the Youngstown charter at that time even though those statutes may be identified as parts of the Revised Code.

"2. No ordinance can conflict with the provisions of a city charter and be effective.

"3. An ordinance requiring retirement of classified civil service employees of a city at 65 years of age conflicts with provisions in a city charter to the effect that the tenure of every employee in the classified service of a city *shall be during good behavior and efficient service."* (Emphasis added.)

In *State, ex rel. Gerhardt,* v. *Krehbiel* (1974), 38 Ohio St. 2d 90, the syllabus states as follows:

"Where a municipal charter prescribes the manner for removal of municipal officers, any attempt by the municipality's legislative body to remove an officer in a manner at variance or in conflict with the charter's directives is a nullity."

Appellees point out that the state statute governing the tenure of civil service employees provides that tenure shall be "during good behavior and efficient service." Significantly, this does not mandate a residency requirement. The Youngstown City Charter adopted the state statute in regard to civil service employees, thus permits only the Civil Service Commission to provide for rules and regulations that govern tenure and termination of employment. Appellees also point out that there is no significant difference between an ordinance which fixes a mandatory retirement age and one which imposes residency requirements. Each improperly attempts to add another condi-

tion for which a civil servant can be terminated. Each attempts to add a third qualifier to the statutory "during good behavior and efficient service"; consequently, each conflicts with R. C. 143.27 as adopted in the Youngstown City Charter.

We hold that the trial court properly concluded that the Youngstown City Ordinance imposing residency was in conflict with the City Charter and was consequently invalid. Appellants' second assignment of error is overruled.

Passing over the appellants' fourth assignment of error momentarily, since this assignment is the heart of the instant case, we come now to appellants' fifth assignment of error, which states as follows:

"The trial court erred in overruling appellants' motion to dismiss plaintiff-appellee, Fraternal Order of Police, Youngstown Lodge No. 28, as a party to this action."

Appellants contend that the trial court should not have permitted the Fraternal Order of Police to participate in this litigation. They contend that the association does not have an interest in the proceedings and should not be allowed declaratory relief. This assignment of error is without merit. 16 Ohio Jurisprudence 2d 583, Declaratory Judgments, Section 5, states as follows:

"In other words, the basic purpose of the act is to relieve parties from acting at their peril in order to establish their legal rights."

We find that the Fraternal Order of Police Association was a proper party in the court below. We, therefore, overrule appellants' fifth assignment of error.

Appellants' fourth assignment of error, which poses the most difficult question, states as follows:

"The trial court erred in its finding that Rule IV, Section 9 (F) duly promulgated by the Youngstown Civil Service Commission is void and unconstitutional."

The trial court in addressing itself to the question formulated by this assignment of error posed two issues to be decided:

"1. Is Rule IV, Section 9(F), adopted Jan. 20, 1972 operative as against civil service employees who entered

the classified service of the city prior to Jan. 20, 1972, that being the date of adoption of said Rule.

"2. Does the Rule violate the due process clause of the Fifth Amendment of the United States Constitution."

The first issue brought forth the question of the retroactive application of Rule IV, Section 9(F); and the second issue brought forth the question of constitutionality of the rule.

The city of Youngstown and its employees are in a unique situation relative to the question of residency requirement. As discussed previously herein, the city of Youngstown had no valid residency requirement because of the conflict with the Charter and the lack of power of the police chief to promulgate such a requirement so that the question arising in relationship to retroactivity is unique only to the instant case under its facts.

The trial court's opinion as to the issue of retroactivity of the Civil Service Commission's rule was as follows:

"Coming now to consider the first of said issues, certain constitutional provisions and limitations must be considered.

"Article II, Section 28 (1851), Constitution of Ohio provides as follows:

" 'The general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts* * *.'

"The words, 'retrospective' and 'retroactive', as applies to laws are synonymous. Very early in our history, Justice Story, in the case of Society for the Propagation of the *Gospel* v. *Wheeler, et al.* (1814), 22 Fed. Cases, Page 756, Case No. 13156, reported by 2 Gall 105, defined the term, 'retrospective'.

"In that case, the Constitution of New Hampshire came into question. In the 23rd Article of the Bill of Rights of that Constitution is the following declaration:

" 'Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made either for the decision of civil causes or the punishment of offenses.'

"Justice Story defined 'retrospective' as follows:

" 'Upon principle, every statute which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty; or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective, and this doctrine seems fully supported by the authorities.'

"The Supreme Court of Ohio, and its lower courts, have consistently followed the definition of Justice Story. (*Bairden* v. *Holden,* 15 O. S. 207 at 210; *Miller* v. *Hixson,* 64 O. S. 39; *Sylvania Buses* v. *Toledo,* 118 O. S. 187 at 198; *Wheatley* v. *A. I. Root Co.,* 147 O. S. 127, Syl. 2.)

"It has been held that a retroactive enactment, extinguishing a vested legal relationship, would amount to deprivation of property without due process of law, and thus violates the 14th Amendment of the Constitution of the United States. (*Euclid* v. *Zangerle,* 145 O. S. 433.)

"The Supreme Court of Ohio succinctly defined 'retroactive' laws as follows:

" 'A statute which creates a new obligation in respect to transactions or considerations already past is violative of Article II, Section 28 of the State Constitution, which forbids the enactment of retroactive laws by the general assembly.' (*Safford, Supt. of Ins.,* v. *Metropolitan Life Ins.,* 119 O. S. 333 (1928).)

"The foregoing interpretation of the term 'retroactive' or 'retrospective' has been followed, generally, in the United States. (*Neild* v. *District of Columbia,* 110 F. 2d 246, 254; *State, ex rel. James,* v. *Mills,* Del. Ct. in Banc, 57 A. 2d 99, 102; *London Guarantee & Accident Co.* v. *Pittman,* 25 S. E. 2d 60, 65, 66; *Wilson* v. *Greer,* 151 P. 629, 632.)

"A retroactive statute not only violates the Constitution of Ohio, but also violates Article I, Section 10, of the United States Constitution, which is as follows:

" 'No state shall * * * pass * * * law impairing the obligation of contracts * * *.'

"The above limitation upon the states by the Federal Constitution applies to municipal ordinances and administrative regulations having the force and operation of

statutes. (221 U. S. 400; 271 U. S. 403 at 411; 115 U. S. 674; 172 U. S. 1; 202 U. S. 453; 232 U. S. 548; *Cuyahoga River Power Co. v. City of Akron*, 240 U. S. 462 (1916).)"

The trial court noted that the rule as to residency by the Civil Service Commission prior to the adoption of Rule IV, Section 9 (F) on January 20, 1972, was Rule No. 7, which states as follows:

"Applicants must be citizens of the United States. For positions in the City service, applicants must have resided in the City of Youngstown at least one year last past."

The trial court concluded that Rule No. 7 was the only valid rule in force as to the residency for the classified employees of the city of Youngstown, and it held that those employees who entered the classified service of the city of Youngstown prior to January 20, 1972, were not required by the rules of the Civil Service Commission to maintain a residence in the City of Youngstown. The court further held that the rule was not enforceable against any employee entering service before January 20, 1972.

We hold that the attempted enforcement of this rule by the Civil Service Commission against employees hired prior to January 20, 1972, was retroactive in operation, and find that the trial court ruled correctly on this issue.

We come now to the constitutionality of Rule IV, Section 9(F), enforcing a residency requirement upon classified employees of the city of Youngstown with the alternative of facing termination of employment if the employee does not comply.

The appellants' argument in this regard is that there is no vested right of a city employee to employment; that such rule is reasonable and it is a proper function of the Civil Service Commission to promulgate such a rule; that it does not unreasonably deprive appellees of liberty or property; and that such a residency requirement has been determined to be both reasonable and necessary for the preservation of the municipality.

We note that there is a division of authority as to a government's power to promulgate residency requirements. This division of authority develops oftentimes from the

unique situation of the particular facts of cases being decided and also because of the tests applied by the courts in their reasoning as to the validity or invalidity of such rules. For example, see *Fugate* v. *City of Toledo,* United States District Court for the Northern District of Ohio, Western Division, No. 73-251, unreported, decided in 1974. The *Fugate* Court had before it the question of residency requirements of the members of the Toledo Police and Fire Departments. The court chose to use the test as to the validity of the Toledo Charter provision requiring residency, known as the "rational basis" test, and upheld the requirement of residency, on the basis that the rule showed a rational relationship to a valid state purpose. There are other cases, the majority of which deal with safety forces, police and firemen, that do not use a standard to follow to determine the validity of ordinances and civil service rules as to residency other than whether or not the municipality or civil service commission has the power to so regulate. The cases that hold that the municipality or the Civil Service Commission has the right to regulate by providing residency requirements are *Detroit Police Officers Ass'n.* v. *City of Detroit* (1971), 385 Mich. 519, 190 N. W. 2d 97, and *Hattiesburg Firefighters Local 184* v. *City of Hattiesburg* (Miss. 1972), 263 So. 2d 767. The Detroit Police Officers case and the Hattiesburg Firefighters case do not refer to a test or standard to be applied in determining the constitutionality of ordinances or regulations relative to residency requirements.

Another case that permits residency requirements *Ector* v. *City of Torrance* (1973), 10 C. 3d 129, 109 Cal. Reptr. 849, held that a statute in California prohibiting residency requirements for city employees was not applicable to a charter city, and that a charter provision requiring residency was not unconstitutional.

In *Abrahams* v. *Civil Service Comm.* (1974), 65 N. J. 61, 319 A. 2d 483, the Supreme Court of New Jersey held that the right to live outside of city boundaries was subordinate to rational policy to restrict employment to residents. In the *Abrahams* case the strong dissent interprets

*Shapiro* and *Maricopa County, infra* (United States Supreme Court cases), as controlling, and uses the "compelling governmental interest" standard. Other courts used the test of "compelling governmental interest" standard.

We do not have guidance from the Ohio Supreme Court, since no cases were found by this court, nor were any brought to our attention by the litigants herein. There is an Ohio Court of Appeals Case, *Quigley* v. *Blanchester* (1968), 16 Ohio App. 2d 104, that holds:

"A municipal ordinance which requires members of the police department to reside in or within two miles of the municipality is a reasonable exercise of the police power of such municipality and is not violative of the Ohio Constitution."

This case deals with a non-charter village, and some facts therein are at variance with the instant case. Furthermore, this case does not give an adequate disposition of the question of retroactivity.

The cases using the "compelling governmental interest test" have made a determination as to the interest that the employees have in their employment and the constitutional right involved holding that any infringement on this right must be first shown by the state to be of a compelling governmental interest in order for the infringement to be upheld. The "compelling interest" standard is more strict in interpreting the constitutional validity of these statutes or rules than the "rational basis" test.

In *Donnelly* v. *City of Manchester* (1971), 111 N. H. 50, 274 A. 2d 789, headnotes 4, 7 and 8 of 274 A. 2d state:

4. "Right of every citizen to live where he chooses and to travel freely not only within state but across its borders is fundamental right guaranteed both by state and federal Constitutions."

7. "Fact that there was no constitutional right to work for city did not mean that granting of privilege of working for city could be conditioned upon surrender of fundamental constitutional right of citizen to live where he chooses."

8. "Discrimination against some in public employment

can no longer be practiced on basis that the employment is a privilege which can be withheld from all.''

The court stated, at page 51, 274 A. 2d at 791:

''The right of every citizen to live where he chooses and to travel freely not only within the state but across its borders is a fundamental right which is guaranteed both by our own and the Federal Constitutions [*sic*]. *Ratti* v. *Hinsdale Raceway*, 109 N. H. 270, 249 A. 2d 859 (1969); *Shapiro* v. *Thompson*, 394 U. S. 618, 89 S. Ct. 1322 (1969).''

In *Hanson* v. *Unified School District No. 500* (D. Kan. 1973), 364 F. Supp. 330, headnotes one through five state:

1. ''School teachers alleging that regulation of school district requiring that teachers in district reside in county in which district was located constituted state action infringing upon their constitutional rights stated cause of action cognizable under Civil Rights Act. 42 U. S. C. A. Section 1983; U. S. C. A. Const. Amend. 14.''

2. ''When called upon to decide whether law or regulation denies equal protection, court looks to character of classification in question, individual interests affected by classification, and government interests asserted in support of classification. U. S. C. A. Const. Amend. 14.''

3. ''Right to work for living in common occupations of community is secured by Fourteenth Amendment. U. S. C. A. Const. Amend. 14.''

4. ''Availability of governmental benefit, such as employment, may not be made to depend upon whether benefit is characterized as 'right' or as 'privilege.' U. S. C. A. Const. Amend. 14.''

5. ''Teachers, by signing contracts with school district containing provisions that they must live within county where school district was located, did not voluntarily waive their right to exercise constitutional rights to live and work where they chose. U. S. C. A. Const. Amend. 14.''

The cases that referred to the test to be used as the ''compelling governmental interest test'' followed the United States Supreme Court case of *Shapiro* v. *Thompson* (1969), 394 U. S. 618, in which paragraph five of the syllabus states:

"In moving from jurisdiction to jurisdiction appellees were exercising a constitutional right, and any classification which penalizes the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional."

*Shapiro* struck down durational residency requirements as being discriminatory and unconstitutional, but indicated that not all durational requirements would be unconstitutional if the state could show a compelling governmental interest in infringing upon the freedom of travel of the individual.

In *Memorial Hospital* v. *Maricopa County* (1974), 415 U. S. 250, 39 L. Ed. 2d 306, headnote 1 of 39 L. Ed. states:

"A state statute requiring a year's residence in a county as a condition to an indigent's receiving nonemergency hospitalization or medical care at the county's expense is repugnant to the equal protection clause, since such a durational residency requirement creates an invidious classification that impinges on the right of interstate travel by denying basic necessities of life to newcomers where the state fails to show a compelling state interest in such a classification nor demonstrates that in pursuing legitimate objectives, it has chosen means which do not unnecessarily impinge on constitutionally protected interests."

A thorough discussion of this matter is found in *Krzewinski* v. *Kugler, Jr.* (D. N. J. 1972), 338 F. Supp. 492. This was a United States District Court case involving a New Jersey statute providing for residency requirements. The following statement is from page 497:

"Recently, however, the Supreme Court has made fairly clear that when the differentiation adversely affects other fundamental constitutional rights, the test to be applied is much more stringent. The statute may be upheld only if the state is able to demonstrate a compelling interest in maintaining the difference in treatment between the classes. *Graham* v. *Richardson*, 403 U. S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971); *Shapiro* v. *Thompson*, 394 U. S. 618, 634, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969); *Sherbert* v. *Verner*, 374 U. S. 398, 406, 83 S. Ct. 1790, 10 L.

Ed. 2d 965 (1963); *Bates* v. *City of Little Rock*, 361 U. S. 516, 524, 80 S. Ct. 412, 4 L. Ed. 2d 480 (1960)."

In its determination as to the police and firemen residency requirements, the court used the stringent test of "compelling governmental interest." However, in *Krzewinski* the court found from evidence in the record that it was sufficiently demonstrated by the state of New Jersey that there was a compelling governmental interest in requiring police and firemen to adhere to a residency requirement and upheld the New Jersey statute. In applying the stringent "compelling governmental interest test," the *Krzewinski* case relied on the *Shapiro* case and, at page 498, explained the interest that government employees have in their jobs, as follows:

" 'It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state.' *King* v. *New Rochelle, supra* 442 F. 2d at 648 (footnote omitted). The soundness of this conclusion is even more apparent when it is considered together with the refusal of the Supreme Court in *Shapiro* to link the right to travel with any specific clause of the Constitution, commerce or otherwise. *Shapiro* v. *Thompson, supra* 394 U. S. at 730, n. 8, 89 S. Ct. 1322. See *Graham* v. *Richardson*, 403 U. S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971)."

We find that the better test to be used in determining the instant case is that of the "compelling governmental interest" as in the *Krzewinski* case. We now look to the instant case to determine what evidence the Civil Service Commission produced to support a compelling governmental interest theory, and find that there is absolutely nothing in the record to sustain this position. We note this was the finding of the trial court in its reference to the record where, on page 8 of its judgment entry, the trial court stated:

"It has been determined that any classification which serves to penalize the exercise of a constitutional right, unless shown to be necessary to promote a compelling gov-

ernmental interest, is unconstitutional. (*Shapiro* v. *Thompson*, 394 U.. S. 618 at 634.)

The Court further stated:

"The defendants produced no evidence of any kind from which the Court could determine the reasonableness of this Rule. Reasonableness is a matter of fact, and must be proved by evidence. No evidence having been produced to support the reasonableness of said Rule, the Court must assume that the reasonableness of said Rule could not be sustained by the defendants. There must be some relationship between the work required of a classified employee, and the necessity of his being a resident of the city of Youngstown in order to do that work. The city or the Civil Service Commission has produced no evidence on this issue.

"The Court, therefore, finds, in the absence of any evidence which should have been produced on the issue, that under the Constitution of the United States, the Rule sought to be enforced is an unconstitutional interference with the rights of an individual."

Even though the Civil Service Commission did not produce evidence in the record as to "compelling governmental interest" regarding the residency requirement for policemen we must be realistic as to the question of whether or not a residency requirement for policemen will meet the strict test of compelling governmental interest, and we find that the lower court could have taken judicial notice of the nature and type of duties evolving around a policeman. The job of a policeman has distinguishing characteristics from all other city employees as was stated in *Detroit Police Officers Ass'n* v. *City of Detroit* (1971), 385 Mich. 519, 522, 190 N. W. 2d 97, 98:

"There is a special relationship between the community policed and a policeman. A policeman's very presence, whether actually performing a specified duty during assigned hours, or engaged in any other activity during off-duty hours, provides a trained person immediately available for enforcement purposes.

"Policemen are required by department order to be

armed at all times, and why is this? Simply because by such requirement they are, no matter where they are or what they are doing, immediately prepared to perform their duties. They are charged with law enforcement in the city of Detroit, and obviously must be physically present to perform their duties. The police force is a semi-military organization subject at all times to immediate mobilization, which distinguishes this type of employment from every other in the classified service."

We therefore hold, with regard to police officers, that the lower court erred in its ruling that the residency requirement by the Civil Service Commission was unconstitutional as to policemen who were hired after the passage of the Civil Service Commission's Rule IV, Section 9 (F), on January 20, 1972. We sustain appellants' fourth assignment of error only to the extent that it declares the Civil Service Commission rule unconstitutional as applied to policemen hired after January 20, 1972. By taking judicial notice of the duties of policemen, and finding the existence of a "compelling governmental interest," we hold the Civil Service Commission rule constitutional only so far as it is applied after its effective date of passage.

We have taken judicial notice that there is a compelling reason to require safety personnel to reside within the proximity to their duty station. At the same time, we apparently have exempted a major portion of the police force from the application of the Civil Service residency requirement, effective January 20, 1972. The judicial exemption is not a wholesale release. There is statutory recognition that a policeman or fireman beyond his or her normal work may be called upon for "emergency special duty assignments." (R. C. 737.07.) The very word "emergency" connotes an unseen situation but one demanding reasonably immediate attention. Each policeman or fireman is required as part of his or her duties to be reasonably available to execute duties during such an "emergency." The execution of these emergency duties is not a geographical measurement but, rather, a reasonably timely performance. The Youngstown Safety Forces certain-

ly have enough experience whereby it could be reasonably determined, timewise, as to how soon a member of the police or fire department should be able to answer an "emergency assignment." The promulgation of this time factor as a rule or regulation would insure proper protection for the city and at the same time protect against abuses and misunderstanding. Enforcement would arise out of R. C. 737.12, as a "reasonable and just cause."

Concluding, then, that every citizen has a fundamental right to live where he chooses in addition to the right to travel freely within the state and across its borders, which is protected by the United States Constitution, a residency requirement imposed by a municipality or civil service commission on its employees must meet the test of "compelling governmental interest." This is not to say that a municipality or civil service commission cannot show a "compelling governmental interest," but the burden is upon the municipality or commission to establish such. City employees are performing various duties, as varied as there are departments within the municipality, such as the case of appellee Agnone, at the Youngstown Airport, operated by the city of Youngstown outside of the city's territorial limits. Water department employees install and maintain water lines that extend into the township and even across county borders. Safety forces perform a unique service to the community. Some of these services may be shown to have a "compelling governmental interest" that requires a residency condition with their employment, but there must be some basis established by facts to arrive at this conclusion. In the instant case, it was necessary that the appellants establish these kinds of facts in the record. As the lower court found, there were no such facts established by the appellants as to municipal employees other than those discussed above relative to policemen.

The record indicates as to the appellee, Carmen Agnone, that his residence out of the city limits is closer to his place of employment at the Youngstown Municipal Airport than if he had lived within the city limits, and there was no evidence of any nature to show the compelling in-

terest of the city in enforcing the residency requirement on this appellee.

We, therefore, find that the city of Youngstown and the Youngstown Civil Service Commission have failed to produce evidence of a "compelling governmental interest" and did not meet their burden to support their claim or requirement of residency of these classified civil service employees other than as to policemen after the date of passage of the civil service rule (January 20, 1972). We sustain appellants' fourth assignment of error as to policemen as discussed above and overrule this assignment of error as to appellee Agnone.

*Judgment affirmed in part and reversed in part.*

O'NEILL, J., concurs.
LYNCH, P. J., concurs in part and dissents in part.

LYNCH, P. J. I concur with both the reasoning and decision of the majority opinion in the discussion of the defendants' first, second, third and fifth assignments of error. As to defendants' fourth assignment of error, I concur in the decision of the majority opinion as to the validity of Youngstown Civil Service Rule IV, Section 5, in its application to policemen who have been hired since January 20, 1972, but dissent as to the adoption of the "compelling governmental interest" standard as a basis for upholding its constitutionality in such application. I further dissent in both the reasoning and decision of the majority opinion as to the enforcement of such rule against employees hired prior to January 20, 1972. I further concur in the decision concerning Carmen Agnone, but dissent as to the reasoning for such decision.

Defendants introduced into evidence Section 32.04 of the Youngstown City Ordinance, which provides as follows:

"All employees of the city shall reside within the city limits thereof, except temporary employees where the work engaged in may require special skill and expert knowledge. (Ord. 31810-A, Section 1.)"

The record does not reveal when Youngstown Ordinance 31810-A was adopted, but defendants in their brief state that it was adopted January 31, 1928. Defendants introduced into evidence the testimony of four policemen, including one who was appointed December 20, 1932, and they were all aware of the requirement of Section 32.04 of the Youngstown City Ordinances that all employees of the city must reside within the city limits.

In *Kissos* v. *City of Youngstown,* Mahoning County Court of Common Pleas, No. 195308, unreported, Judge Sidney Rigelhaupt held that Section 52 of the Youngstown Home Rule Charter vests rule-making power solely and exclusively in the Youngstown Civil Service Commission, and that Section 32.04 of the Youngstown City Ordinances was invalid and unenforceable.

As a result of the above decision, the Youngstown Civil Service Commission on January 20, 1972, enacted Rule IV, Section 9(F), which provides as follows:

"Any officer or employee not residing within the City limits of Youngstown, except as otherwise provided by Rule IV, Section 5, is subject to dismissal from the service of the City."

The attorneys for both sides indicated that employees of the city of Youngstown living outside of the city limits were given a period of one year to acquire residence within the city.

Defendants introduced into evidence a copy of the civil service rules and regulations of the city of Youngstown, as revised on October 1, 1956. Rule IV applies to applicants for appointment to the classified service, and Section 2 provides in part, as follows:

"Applicants * * * must have been residents of Youngstown for one (1) year just preceding the date of application, except where the Commission may deem otherwise because of special requirements of the position. * * *"

The evidence indicates that this rule was in effect since at least 1935. Defendant further introduced into evidence the Police Manuals from 1929 to the present time which contain the rules and regulations of the Police Department of the city of Youngstown.

The record reveals that the Mayor of Youngstown took action only against two city employees—namely, Mr. Carmen Agnone and Mrs. Eileen Bradford—to discharge them because they resided outside of the city limits in violation of Youngstown Civil Service Rule IV, Section 9(F). Mrs. Eileen Bradford was a policewoman. The action to discharge Mrs. Bradford was rescinded because she complied with the civil service rule.

However, Mr. Agnone, who was employed as a maintenance man at the Youngstown Municipal Airport, did not comply with Youngstown Civil Service Rule IV, Section 9(F). He had been employed as a laborer from 1941 to 1951 when he received his civil service appointment to his present position. He had resided in Youngstown until 1959 when he moved to 2990 Belmar, which is located in Liberty Township, Trumbull County. By letter dated January 20, 1973, Mr. Agnone was notified that he was dismissed effective January 23, 1973, because of his failure to comply with Youngstown Civil Service Rule IV, Section 9, Paragraph F.

Defendants' fourth assignment of error is that the trial court erred in its finding that Rule IV, Section 9(F) of the Youngstown Civil Service Rules and Regulations was void and unconstitutional.

The only pertinent reported Ohio case that has come to my attention is *Quigley* v. *Glanchester* (1968), 16 Ohio App. 2d 104, the syllabus of which reads:

"A municipal ordinance which requires members of the police department to reside in or within two miles of the municipality is a reasonable exercise of the police power of such municipality and is not violative of the Ohio Constitution."

Quigley had been a policeman for some eight years prior to the enactment of the municipal ordinance on residency but had his residence some twenty miles outside the village limits. Due to family conditions, he would not comply with the terms of the ordinance. The court upheld the application of such ordinance to Quigley. In my opinion the facts in the *Quigley* case are identical to the Youngstown

employees hired prior to January 20, 1972. Therefore, the decision of the majority opinion in the enforcement of Civil Service Rule IV, Section 5, against employees hired prior to January 20, 1972, is in direct conflict with the *Quigley* case.

On April 21, 1969, the case of *Shapiro* v. *Thompson* (1969), 394 U. S. 618, which concerned the constitutionality of state statutes requiring all applicants for welfare assistance to have resided within the jurisdiction of such state for at least a year immediately preceding their aplication for assistance, was decided. The court held such statutes unconstitutional, because they deny equal protection of the laws to applicants and penalizes their constitutional right to interstate travel. The court further held that any classification which penalizes the exercise of the constitutional right of interstate travel, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional.

The holding in the *Shapiro* case was followed in *Memorial Hospital* v. *Maricopa County* (1974), 415 U. S. 250, which held that an Arizona statute requiring a year's residence in a county as a condition to an indigent's receiving non-emergency hospitalization or medical care at the county's expense to be unconstitutional. In the *Memorial Hospital* case, *supra* at 254, the United States Supreme Court said:

"The right of interstate travel has repeatedly been recognized as a basic constitutional freedom. Whatever its ultimate scope, however, the right to travel was involved in only a limited sense in *Shapiro*. The Court was there concerned only with the right to migrate, 'with intent to settle and abide' or, as the Court put it, 'to migrate, resettle, find a new job, and start a new life.' [394 U. S.] at 629. Even a bona fide residence requirement would burden the right to travel, if travel meant merely movement. But, in *Shapiro*, the Court explained that '(t)he residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites' for assistance and only the latter was held to be unconstitutional. *Id.*, at 636.

Later, in invalidating a durational residence requirement for voter registration on the basis of *Shapiro*, we cautioned that our decision was not intended to 'cast doubt on the validity of appropriately defined and uniformly applied bona fide residence requirements.' *Dunn* v. *Blumstein*, 405 U. S. 330, 342, n. 13 (1972)."

Since the *Shapiro* case and other United States Supreme Court cases following it, several cases concerning state and municipal residency requirements for employment purposes have been reported. There is some conflict between the various cases, but enough cases have been reported to establish a trend.

I agree with the weight of authority which is that municipal ordinances or regulations requiring all municipal civil service employees to reside within corporate limits of such municipality are constitutionally valid. *Ector* v. *City of Torrance, infra; Abrahams* v. *Civil Service Comm.* (1974), 65 N. J. 61, 319 A. 2d 483; *Hattiesburg Firefighters Local 184* v. *City of Hattiesburg* (Miss. 1972), 263 So. 2d 767; *Williams* v. *Civil Service Comm. of Detroit* (1970), 383 Mich. 507, 176 N. W. 2d 593; *Fire Fighters Local 1645* v. *Salt Lake City* (1969), 22 Utah 2d 115, 449 P. 2d 239.

*Contra* to prevailing authorities are *Hanson* v. *Unified School District No. 500* (D. Kan. 1973), 364 F. Supp. 330, which held unconstitutional a school district regulation requiring teachers to live within the county in which the school district was located, and *Donnelly* v. *City of Manchester* (1971), 111 N. H. 50, 274 A. 2d 789, which held that a municipal ordinance which required all municipal classified employees be or become residents of the municipality was constitutionally invalid as to school teachers.

A group of cases concern the constitutionality of state and municipal laws which give hiring preference to residents for at least one year over residents of less than one year. Cases that held such laws unconstitutional are *Eggert* v. *City of Seattle* (1973), 81 Wash. 2d 840, 505 P. 2d 801; *State* v. *Wylie* (Alaska 1973), 516 P. 2d 142; and *Carter* v. *Gallagher* (D. Minn. 1971), 337 F. Supp. 626. *Contra* is *Town of Milton* v. *Civil Service Comm.* (1974), 365 Mass.

368, 312 N. E. 2d 188, where the Supreme Judicial Court of Massachusetts held such a statute constitutional. Although the Youngstown Civil Service Rules and Regulations has had a similar provision—namely, Article IV, Section 5, formerly Article IV, Section 2—for many years, this question is not an issue in this case.

The leading case at this time appears to be *Ector* v. *City of Torrance* (1973), 10 C. 3d 129, 109 Cal. Rptr. 849, for which the United States Supreme Court denied certiorari in 415 U. S. 935. The *Ector* case was quoted with approval in *Abrahams* v. *Civil Service Comm., supra.*

The *Ector* case cites other cases upholding the constitutionality of municipal employee residence requirements, most of which have been cited already in this opinion, and states as follows, quoting from 10 C. 3d at 135:

"Among the governmental purposes cited in these decisions or now urged by amici curiae are the promotion of ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee performance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absenteeism and tardiness among municipal personnel; ready availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries. We cannot say that one or more of these goals is not a legitimate state purpose rationally promoted by the municipal employee residence requirement here in issue.

"Appellant contends in the alternative that respondent's residence requirement must be judged by the 'strict' equal protection test, *i. e.*, must be shown to be 'necessary' to promote a 'compelling' governmental interest. To justify invoking the strict standard of scrutiny, appellant proposes a number of 'fundamental rights' which he asserts are curtailed by the provision in question.

"First it is said that the residence requirement im-

pinges on appellant's 'right to travel.' The contention is not persuasive. Viewed realistically, appellant is claiming the right to 'travel' between his home and his place of employment each morning and evening of each working day—in other words, a 'right to commute.' We cannot discern such a right in the United States Supreme Court decisions relied on by appellant. Clearly the cultural and educational rewards of international travel (*Kent v. Dulles* [1958], 357 U. S. 116, 126-127), are not reaped from routine daily trips of a harassed metropolitan commuter. Nor have such trips any relevance whatever to the right to migrate among the several states for the purpose of starting a new life without fear of being denied welfare if a job is not immediately available (*Shapiro v. Thompson* [1969], 394 U. S. 618), or to the right to move within the confines of a state for the same purpose without fear of being denied prompt access to public housing facilities (*King v. New Rochelle Municipal Housing Authority* [2d Cir. 1971], 442 F. 2d 646; *Cole v. Housing Authority of City of Newport* [1st Cir. 1970], 435 F. 2d 807). Each of the latter decisions invalidated not a residence requirement as such but a *durational* residence requirement, *i. e.,* a requirement that the migrant not only be a resident but maintain that status for a certain minimum period of time before he qualifies for benefits. There is no similar 'waiting period' in the provision before us, but simply a requirement of residence in the community in order to be a municipal employee. Nothing in *Shapiro* or any of its progeny stands for the proposition that an indigent may demand public assistance without being a bona fide resident of the state or locality to which he has migrated. (See also *Dunn v. Blumstein* [1972], 405 U. S. 330, 334.)"

In *Abrahams v. Civil Service Comm., supra,* the court said as follows, in 319 A. 2d 488-489:

"Appellant relies on *Krzewinski v. Kugler*, 338 F. Supp. 492, 497-498 (D. N. J. 1972) and *Donnelly v. City of Manchester*, 111 N. H. 50, 274 A. 2d 789 (S. Ct. 1971). Both of these cases are in point, as involving municipal employment residence requirements. Both cite *Shapiro* as author-

ity for the view that such requirements impair the right to travel. *Krzewinski* imposed upon the municipality the burden of demonstrating a 'compelling' state interest to justify the impairment but found such an interest to exist (where the residence requirement was as to police officers); *Donnelly* did not in terms impose the compelling state interest test but rather weighed the 'reasonableness of a restriction upon private rights' against the 'importance of the public benefit' (274 A. 2d, at 791), and found the restriction invalid.

"Both *Krzewinski* and *Donnelly* suffer as precedents pertinent here in the light of their failure to appreciate the limited effect of *Shapiro,* as explicated subsequently in *Memorial Hospital,* (a) as elevating the right of travel to 'fundamental' status only in respect of the right of migration between states; and (b) as expressly abnegating any hostile view of the validity of a simple (non-durational) residence requirement in an appropriate case.

"When the thesis of impairment of a 'fundamental' right of travel by a municipal employment residence requisite is seen as stripped of supporting federal constitutional precedent, and it is appraised on its inherent merits, it is found to lack weight. The undeniable general right of people to live near but outside the boundaries of a city in whose government they aspire to be employed is, realistically, not equitable with the right to travel throughout the land vouchsafed by the federal constitution to all United States citizens, *Paul* v. *Virginia,* 75 U. S. (8 Wall.) 168, 19 L. Ed. 357 (1869); nor even, sensibly conceived, with the right to travel at all, but rather, as bluntly stated in *Kennedy,* merely the common right to live where one will. The same applies to city employees residing in the city but aspiring to move elsewhere, yet near enough to commute to their city jobs. The 'right' involved is subordinate to a rational municipal policy to restrict employment to residents."

The *Abrahams* case cited *Kennedy* v. *City of Newark* (1959), 29 N. J. 178, 148 A. 2d 473, in which the court said, as follows, at page 183, 148 A. 2d at 476:

"The question is not whether a man is free to live where he will. Rather the question is whether he may live where he wishes and at the same time insist upon employment by government. *Cf. McAuliffe* v. *City of New Bedford,* 155 Mass. 216, 29 N. E. 517 *(Sup. Jud. Ct.* 1892). If there is a rational basis for a residence requirement in furtherance of the public welfare, the constitutional issue must be resolved in favor of the legislative power to ordain it."

With reference to the members of the Youngstown Police Department, whom plaintiff Fraternal Order of Police Lodge No. 28 represent, all reported cases that have come to our attention hold that municipal ordinances or regulations requiring police officers and firemen to reside within the municipality are constitutionally valid. *Detroit Police Officers Assn.* v. *City of Detroit* (1971), 385 Mich. 519, 190 N. W. 2d 97, appeal dismissed for want of a substantial federal question in 405 U. S. 950 (1972); *Ahern* v. *Murphy* (C. A. 7, 1972), 457 F. 2d 363; *Hattiesburg Firefighters Local 184* v. *City of Hattiesburg, supra; Krzewinski* v. *Kugler* (D. N. J. 1972), 338 F. Supp. 492; *Jackson* v. *Firemen's and Policemen's Civil Service Comm. of Galveston* (Tex. Civ. 1971), 466 S. W. 2d 412; *Salt Lake City Fire Fighters Local 1645* v. *Salt Lake City, supra; Fugate* v. *City of Toledo,* United States District Court, Northern District of Ohio, Western Division, No. C 73-251, unreported, decided May 14, 1974.

The leading case, at this time, appears to be *Detroit Police Officers Assn.* v. *City of Detroit, supra,* which is cited in the majority opinion. *Ahern* v. *Murphy, supra* followed the *Detroit Police Officers Assn.* case. The headnotes in the *Ahern* case state:

1. "Denial of petition for writ of certiorari by United States Supreme Court carries no precedential weight whatever."

2. "United States Supreme Court's dismissal of appeal for want of substantial federal question is a decision on merits of the case appealed."

3. "United States Supreme Court's dismissal for want

of substantial federal question in a state court appeal is fully equivalent to affirmance on merits in an appeal from federal court insofar as federal questions are concerned. 28 U. S. C. A. Section 1257 (1, 2)."

4. "United States Supreme Court's dismissal for want of federal question of an appeal from Michigan Supreme Court's decision that ordinance requiring city policemen to reside within corporate boundaries of city did not violate equal protection clause of Fourteenth Amendment was dispositive of later appeal attacking constitutional sufficiency of Chicago ordinance and rule of city police department requiring policemen to reside within corporate boundaries of city of Chicago and the United States Supreme Court's decision was not merely persuasive.' 28 U. S. C. A. Section 1257 (1, 2); U. S. C. A. Const. Amend. 14; S. H. A. Ill. ch. 24, Section 3-7-3.1."

In *Hattiesburg Firefighters Local 184* v. *City of Hattiesburg, supra* at 771, the court said as follows:

"We are of the opinion that the ordinance is not an improper classification because the availability of firemen and policemen on short notice directly affects public health and safety in the event of fires, riots or violations of law involving a large number of people. An ordinance requiring such employees to reside within the city has 'some relevance to the purpose for which the classification is made' in that they would more likely be available in the event of an emergency."

In *Krzewinski* v. *Kugler, supra* at 499-500, the court said as follows:

"The truly important interests to be realized by the residency requirement demand recognition by the Court of the modern pattern of urban disruption and dissipation prevalent today. Rioting and looting have occurred in major New Jersey cities, such as Newark, Paterson, Plainfield and more recently in Camden and Hoboken. A substantial number who have studied the problem attribute much of this lawlessness to a deeply rooted disrespect for an absentee police force which governs by day and resides afar at night. According to the proponents of this view, a

policy of requiring fire department and police force residency would tend to increase the presently low degree of community cooperation uniformly observed by law enforcement officials. While this Court would not impute a conscious or deliberate neglect of duty to a policeman or fireman living apart from his municipal employer, we recognize that reasonable men could conclude that a total disengagement between work hours and personal life could detrimentally affect his attitude toward the community and the people he serves. If with each nocturnal escape he manages to leave city problems behind, it may be just a matter of time before the officer develops at least an unconscious disdain for the city and its residents. The mutual advantages of residency required by N. J. S. A. 40:47-5 and similar laws was noted by The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report, The Police (1967).

" 'Aside from convenience, local residence avoids the impression that the police come from the outside world to impose law and order on the poor and minority groups and also avoids the risk of police isolation from the needs, morals and customs of the community.

" 'Perhaps, more effectively than any amount of training, off duty contact between police and the people they service prevents the stereotyping of police by citizens and of citizens by police.

" 'Wherever possible, police officers should be encouraged to live within city limits for it is important officers have a feeling of commitment to the city, above and beyond the obligation to police it.'

"*See also,* Governor's Select Committee on Civil Disorders, State of New Jersey, Report for Action 163-164 (1968) (recommending residency as a statewide police requirement); *Detroit Police Officers Association* v. *City of Detroit,* 385 Mich. 519, 190 N. W. 2d 97 (1971). Thus, New Jersey has a valid interest in promoting what it has called 'identity with the community' among police and firemen. *Mercandante* v. *City of Paterson, supra,* 111 N. J. Super. at 40, 266 A. 2d at 614; citing *State* v. *Benny,* 20 N. J. 238, 252, 119 A. 2d 155, 162 (1955).

"Two additional considerations magnify the need for direct community association by these uniformed employees. Residency places the off-duty officer physically within the municipality in which he is authorized to perform his duties. This immediate discharge of duties is not to be confused with the exigencies of quick, emergency recall, for it is not the call from the station house but the chance observations of a neighbor or of the officer himself which will prompt his off-duty actions. * * *

"The added presence of off-duty police in an urban municipality to the on duty force, even if the off-duty police are rarely called upon to act, will undoubtedly have a deterrent effect on crime. Additionally, the chance associations and encounters which follow from residence and which may lead to invaluable sources of information will go far towards making each residence policeman a more knowledgeable, qualified officer."

In *Fugate* v. *City of Toledo, supra,* the court held that a charter provision of the city of Toledo requiring all employees of the city to be residents therein must be judged against the rational basis test and will be upheld if it bears a rational relationship to a valid state purpose. Pertinent excerpts of the court's opinion are as follows:

"* * * the Court finds that *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 94 S. Ct. 1076 (1974); *Dunn* v. *Blumstein,* 405 U. S. 330 (1972); and *Shapiro* v. *Thompson,* 394 U. S. 618 (1969), are not controlling here. These cases all involved application of the compelling interest test to *durational* residency requirements. In each case the Court found that the freedom to migrate among the states had been burdened.

"Where, as here, a local charter provision involving social economic issues is being challenged on Fourteenth Amendment equal protection or due process grounds, the Supreme Court has generally required less exacting judicial scrutiny under the traditional rational basis test. Under this test state legislation will be upheld if it bears a reasonable relation to a valid state purpose. See *McGowan* v. *Maryland,* 366 U. S. 420, 425-6 (1961). And as the Court noted in *Dandridge* v. *Williams,* 397 U. S. 471, 485

(1970), this test has been applied to state legislation restricting the availability of employment opportunities.
* * *

"The City argues that Section 61 and AR-16 are supported by the following reasons:

"1. The availability of police and firemen on short notice is important to public health and safety. Residence within the City helps insure that ready availability.

"2. Police officers are required to be armed at all times and to be immediately prepared to perform their law enforcement duties at any time. The residency requirement helps insure that the City will receive the benefits of this ever vigilant readiness.

"3. Employees who are also City residents feel special motivation toward better performance in their duties than do non-resident employees.

"4. City residence, especially of policemen, tends to help avoid the risk of isolation from the needs and customs of the community and lessens the opportunity for the people to receive the impression that the police commute from the outside world to impose law and order on the poor and minority groups.

"5. Resident employees are more likely than non-residents to have an awareness of the special needs of their employing community.

"6. City employees make decisions daily which directly affect the welfare of the community. By requiring that employees be residents, the rules help to make sure that the employee has a stake in the outcome.

"7. The residency requirement serves partially to insure that the City does not become victim to 'white flight,' whereby white citizens flee to the suburbs in ever-increasing numbers while the city population becomes predominantly non white. The City's residency requirement is thus an important instrument of a municipal policy which seeks to advance integration of the races within the City."

I agree with the *Ector, Abrahams* and *Fugate* cases that the *Shapiro, Memorial Hospital, Dunn* and similar cases on the constitutionality of state laws—which require a

state to show a compelling governmental interest when such laws penalize the constitutional right to interstate travel—apply to durational residency requirements. Therefore, they are inapplicable to the simple residency requirement of Rule IV, Section 9(F) of the Youngstown Civil Service Rules and Regulations.

I further agree with the *Ector, Abrahams* and *Fugate* cases that the test to be applied to the constitutionality of this rule is whether such a rule bears a reasonable relation to a valid state purpose.

I would hold that there is a presumption in favor of the constitutionality of this rule and the burden of showing the unconstitutionality of this rule is upon plaintiffs. 10 Ohio Jurisprudence 2d 227, Constitutional Law, Section 151, and Section 158.

I would find that plaintiffs have not sustained their burden of proof as to the unconstitutionality of this rule either as to its general application or to its specific application to policemen. Therefore, I agree that Rule IV, Section 9(F) of the Youngstown Civil Service Rules and Regulations is constitutionally valid in its specific application to members of the Youngstown Police Department, and that the trial court committed error in holding otherwise.

With reference to the specific application of Rule IV, Section 9(F), of the Youngstown Civil Service Rules and Regulations to plaintiff Carmen Agnone, the facts established by the record must be considered.

Mr. Agnone testified that the Youngstown Airport is located in Trumbull County, approximately twelve miles from downtown Youngstown; that his present address is approximately eight to eight and one-half miles from the Youngstown Airport; that his job requires him to report each and every day to the Youngstown Airport; that he is on call during the time when he is not scheduled to work for any emergency such as a heavy snowfall during the winter months or a plane going off the runway; and that the city of Youngstown owns residence property on the Youngstown Municipal Airport property in which the former General Foreman, Earl Hopkins, who was under

the classified service of the city of Youngstown, had resided for eighteen years. When Mr. Hopkins left, Mr. Agnone took over the position of General Foreman and was offered the residence at the Youngstown Airport, but Mr. Agnone refused. The residence is now being rented out to the Beckett Aviation Corporation. Mr. Agnone is sixty years old, and would like to work another year or two before he retires in order to build up his retirement benefits. This testimony was not contradicted by any evidence introduced by defendants; therefore, we have to accept it as factually correct.

I would find from the undisputed facts of this case that the duties of Mr. Agnone's position require him to be readily accessible to the Youngstown Airport even when he is not scheduled to work; that in recognition of this fact Mr. Agnone's immediate predecessor lived on the Youngstown Airport in a residence owned by the city of Youngstown for eighteen years prior to Mr. Agnone's assuming the position of General Foreman; that Mr. Agnone was offered the use of the residence at the Youngstown Airport but declined; that Mr. Agnone lives in Trumbull County where the Youngstown Municipal Airport is located and is three and one-half to four miles closer to the Youngstown Airport than he would be if he lived in the center of Youngstown.

I would hold under the facts of this case that the application of Rule IV, Section 9(F), of the Youngstown Civil Service Rules and Regulations by the defendant Mayor of Youngstown to plaintiff, Carmen Agnone, was unreasonable and arbitrary and, therefore, constitutionally invalid. 10 Ohio Jurisprudence 2d 193, Constitutional Law, Section 111. Therefore, I agree with the majority decision that the rule cannot be enforced against plaintiff Carmen Agnone.

Plaintiffs introduced no evidence on the question of the specific application of this rule to members of the Youngstown Police Department. The evidence as to Policewoman Eileen Bradford was elicited from defendants' witness on cross-examination.

I would take judicial notice that the conditions of employment and duties of the members of the Youngstown Police Department are similar to those of the other cities, such as Toledo, Ohio; Detroit, Michigan; or Hattiesburg, Mississippi, and that the reasons set out in this opinion from cases arising out of such cities on similar residency requirements as the Youngstown Civil Service Rule are applicable to this case.

Furthermore, Rule 293 of the current Police Manual provides as follows:

"Rule 293. Members shall devote their entire time and attention to the business of the department while on active duty. Although certain hours are allotted for the performance of duty, on ordinary occasions, yet at all times they must be prepared to act immediately on notice that their services are required. Members shall always be subject to call when not on active duty."

Prior Police Manuals had similar provisions.

I would hold that the Youngstown Chief of Police had the power to promulgate Rule 293.

Former Chief of Police John Terlesky testified that on several occasions he had to call members of the police department on emergencies, and they appeared within a half-hour.

The availability of policemen on short notice has been widely recognized as directly affecting public health and safety in the event of riots or violations of law involving a large number of people, and as a basis for requiring policemen to reside within a city so that they would be available in the event of an emergency.

The majority holds that Rule IV, Section 9(F) of the Youngstown Civil Service Rules and Regulations does not apply to employees hired prior to the enactment of such regulation on January 20, 1972, because, in effect, it would be retroactive in its operation.

The record established that Rule IV, Section 9(F) of the Youngstown Civil Service Rules does not penalize any employee who lived outside of Youngstown prior to January 20, 1972. Policewoman Eileen Bradford apparently

lived outside of Youngstown prior to January 20, 1972, but she was not discharged because of this. She was given one year after January 20, 1972, to move into Youngstown which she did, and she was continued as a policewoman. Therefore, the enforcement of this rule is prospective in its requirement that those employees residing outside of Youngstown must move into Youngstown within one year after its enactment on January 20, 1972.

There is nothing in the amended complaint of plaintiffs or the record of preceedings in this case that indicates that any other member of the Youngstown Police Department, except Mrs. Eileen Bradford, resided outside of Youngstown when Rule IV, Section 9(F) went into effect on January 20, 1972. Therefore, I assume that all members of the Youngstown Police Department, except Mrs. Eileen Bradford, resided in Youngstown on January 20, 1972. As to those who did reside in Youngstown, the application of Rule IV, Section 9(F) to them should cause no financial problems. Therefore, in my opinion, there is a serious question whether those policemen who resided in Youngstown on January 20, 1972, have any vested rights that would raise the question of the retroactive application of this rule to them.

The record is silent as to whether Mrs. Eileen Bradford suffered any financial loss or other inconvenience by being forced to move into Youngstown.

The question of the application of municipal residency requirements to employees living outside the municipality at the time such residency requirement was adopted has been considered in a few cases.

In each case that has come to my attention, the application of municipal ordinances or regulations requiring employees living outside the municipality at the time such residency requirement was adopted to move inside the municipality within a reasonable time have been held constitutionally valid against claims that such application was an *ex post facto* law, impaired contracts, or violated due process. *Quigley* v. *Blanchester, supra, Hattiesburg Firefighters Local 184* v. *City of Hattiesburg, supra.*

In *Salt Lake City Fire Fighters Local 1645* v. *Salt Lake City, supra,* the court stated as follows at page 117, 449 P. 2d at 240:

"It is conceded that there will be cases of hardship and inconvenience for some in order to continue their employment with the City, which is regrettable, but we cannot subscribe to the theory of counsel that place of residence is a God-given, constitutional right, determinable and enforceable by an employee against his employer who offers and give the employee his job, unless such right contractually is protected."

The record indicates that Rule IV, Section 9(F) of the Youngstown Civil Service Rules and Regulations was no surprise to the members of the Youngstown Police Department.

Youngstown Ordinance 32.04 was in effect during the tenure of all present members of the Youngstown Police Department until declared invalid in the case of *Kissos* v. *City of Youngstown, supra.* Legally speaking, this ordinance was invalid from its enactment.

However, Rule 280 of the current Police Manual provides as follows:

"Members shall not violate any of the laws of the United States, State of Ohio, or ordinances of the City of Youngstown."

Prior Police Manuals had similar provisions. I would hold that the Youngstown Chief of Police had the power to promulgate Rule 293.

Thus, members of the Youngstown Police Department were required under Rule 280 of their Police Manual to obey Youngstown Ordinance 32.04 until it was declared invalid. Our court has held that it is presumed that policemen perform acts required by law in accordance with the law. *State* v. *Williams,* 19 Ohio App. 2d 234.

In my opinion, Rule IV, Section 9(F), of the Youngstown Civil Service Rules and Regulations is not an *ex post facto* law in its requirement that policemen living outside the municipality of Youngstown must move inside Youngstown within one year of the enactment of the rule, on January 20, 1972.