Rockingham
No. 92-186

SEABROOK POLICE ASSOCIATION

v.

TOWN OF SEABROOK

December 30, 1993

*McKittrick Law Offices*, of North Hampton (*J. Joseph McKittrick* on the brief and orally), for the plaintiff.

*Holmes & Ells*, of Hampton (*Gary W. Holmes* on the brief and orally), for the defendant.

THAYER, J.   The plaintiff, Seabrook Police Association (association), appeals from the Superior Court's (*O'Neill*, J.) determination upholding the requirement that police officers employed by the Town of Seabrook (town) must reside within the town. We affirm.

In 1982, the town adopted a home rule charter pursuant to RSA chapter 49-B. As amended in 1983, part II, article 23 of the charter states:

"The Chief of Police and all department employees shall reside within the Town during the period of their employment. The chief and the employees hired hereafter shall be allowed up to twelve months to establish residency once they become employed. (The application of the residency requirement provisions for police will apply to only individuals hired after the date of adoption of the Charter.)"

In 1987, the town selectmen sought to enforce the residency requirement and notified its police officers, including those who were hired before the home rule charter was adopted, that officers who did not comply with the residency requirement by December 31, 1987, would be discharged. The association sought injunctive and declaratory relief, arguing that the right to live where one chooses is a fundamental right protected by the New Hampshire Constitution. The town conceded this point but argued that the need for quick response time occasioned by "unique safety concerns" provided a compelling

State interest outweighing the police officers' right to live outside the town. On February 28, 1992, the trial court found:

"[T]he residency requirement imposed on the Seabrook Police Department is valid in light of the compelling state interests which the Town has advanced in support thereof . . . . The safety concerns attendant to a small seacoast town as exacerbated by the existence of a nuclear generation plant are public interests important enough to justify the restriction on the officers' private rights."

On appeal, the association argues: (1) the residency requirement violates the right to travel and live where one chooses under part I, articles 1 and 2 of the New Hampshire Constitution; (2) the residency requirement violates the equal protection provisions contained in part I, articles 1 and 2 of the New Hampshire Constitution; and (3) the town forced the association to litigate a clearly defined and established right, thereby entitling the association to attorney's fees. Because the town prevails on the first two arguments, we need not address the attorney's fees issue. We note at the outset that this decision is based solely on the New Hampshire Constitution pursuant to the association's reliance on State law affording greater protection than federal law. *State v. Ball*, 124 N.H. 226, 232, 471 A.2d 347, 350–51 (1983); *see Michigan v. Long*, 463 U.S. 1032, 1041 (1983).

We originally addressed the issue of municipal residency requirements in *Donnelly v. City of Manchester*, 111 N.H. 50, 274 A.2d 789 (1971), in which the plaintiff schoolteacher challenged a Manchester ordinance requiring all city employees to reside in Manchester within twelve months of being hired. Basing our decision on both State and Federal Constitutions, we held that such an ordinance restricted the fundamental right of municipal employees to live where they wished and to travel freely within and across the State's borders, and that such a restriction could only be justified upon a showing of an important public interest. *Id.* at 51–52, 274 A.2d at 791. We recognized at that time that there may be certain "employees whose residence near their place of duty may . . . be important enough to justify a restriction upon their place of residence . . . ." *Id.* at 52, 274 A.2d at 791. We found no such justifying circumstances surrounding the employment of teachers, however, and thus invalidated the ordinance. *Id.* at 53, 274 A.2d at 792.

Subsequently, the United States Supreme Court ruled that the right to travel under the Federal Constitution does not encompass a right to be employed by a municipality while living elsewhere, and in so doing upheld an ordinance requiring city employees to live within

the City of Philadelphia. *McCarthy v. Philadelphia Civil Serv. Comm'n*, 424 U.S. 645, 646–47 (1976).

Based upon the *McCarthy* decision, the City of Manchester again asked us to enforce its residency requirement for municipal employees, arguing that the *McCarthy* reasoning should be applied. We reaffirmed *Donnelly*, basing our determination upon the State constitutional right to travel. *Angwin v. City of Manchester*, 118 N.H. 336, 336–37, 386 A.2d 1272, 1273 (1978).

The parties here do not ask us to revisit the constitutional analysis set forth in *Donnelly* and *Angwin*. Rather, both the association and the town agree that while the right to travel is fundamental, it is not absolute, and may be limited upon a showing that the restriction serves a public interest which is important enough to justify the restriction of the right. This case raises the issue of whether the duties of these police officers are, as stated in *Donnelly*, "important enough to justify a restriction upon their place of residence." *Donnelly v. City of Manchester*, 111 N.H. at 52, 274 A.2d at 791.

In essence, the town must show that the restriction is necessary to achieve a compelling State interest. *Merrill v. City of Manchester*, 124 N.H. 8, 15, 466 A.2d 923, 928 (1983). Our inquiry does not end, however, upon this showing. The town must also show that the regulation is reasonably related to its objective and does not unduly restrict the fundamental right in question. *Powers v. Town of Hampton*, 125 N.H. 273, 276, 480 A.2d 143, 145 (1984). In *Powers*, we held that a restriction was undue because it was "greater than necessary to effectuate the town's legitimate objective." *Id.* (designating entire twenty-four foot width of private way as fire lane unduly restricted fundamental property rights where fifteen feet would be sufficient); *see also Metzger v. Town of Brentwood*, 117 N.H. 497, 503, 374 A.2d 954, 958 (1977) (zoning ordinance requiring 200 feet of frontage for public vehicle access an unreasonable regulation where 123 feet of frontage provided ready access). As applied in *Powers* and *Metzger*, the requirement that regulations be neither unduly restrictive nor unreasonable is similar to the federal "narrowly tailored" requirement. *See Planned Parenthood v. Casey*, 112 S. Ct. 2791, 2817 (1992) (regulation touching upon fundamental interest must be drawn in narrow terms to survive strict scrutiny); *Kilgus v. Cunningham*, 602 F. Supp. 735, 739 (D.N.H.) (regulation may not unduly infringe on protected freedom; governmental purpose cannot be pursued by means that broadly stifle fundamental liberties when the end can be more narrowly achieved), *aff'd*, 782 F.2d 1025 (1st Cir. 1985).

Other jurisdictions addressing this issue have invariably held that residency requirements, as applied to police officers like those in

Seabrook who were hired after the passage of the ordinance, pass constitutional muster. *See, e.g., Krzewinski v. Kugler*, 338 F. Supp. 492, 501 (D.N.J. 1972); *Ector v. City of Torrance*, 10 Cal. 3d 129, 134, 514 P.2d 433, 436, 109 Cal. Rptr. 849, 851–53 (1973), *cert. denied*, 415 U.S. 935 (1974); *Carofano v. City of Bridgeport*, 196 Conn. 623, 643, 495 A.2d 1011, 1021 (1985); *Detroit Police Officers Ass'n v. City of Detroit*, 385 Mich. 519, 522–23, 190 N.W.2d 97, 97 (1971), *appeal dismissed*, 405 U.S. 950 (1972); *Fraternal Order of Police v. Hunter*, 49 Ohio App. 2d 185, 200, 360 N.E.2d 708, 717 (1975), *cert. denied*, 424 U.S. 977 (1976); *cf.* Annotation, *Validity, Construction, and Application of Enactments Relating to Requirement of Residency Within or Near Specified Governmental Unit as Condition of Continued Employment for Policemen or Firemen*, 4 A.L.R.4TH 380 (1981).

These courts cite various reasons for upholding the residency requirements for police officers, including quicker emergency response time which enhances community safety, improved police performance due to a tangible stake in the community, greater police knowledge of the conditions of the community, improved community attitudes toward the police, and reduced absenteeism. *See Ector*, 10 Cal. 3d at 135, 514 P.2d at 436, 109 Cal. Rptr. at 852; *Clinton Police Dept. v. City of Clinton*, 464 N.W.2d 875, 878 (Iowa 1991).

While the majority of these courts analyze the residency requirements under the rational basis test, the *Krzewinski* and *Hunter* courts upheld residency requirements under the strict scrutiny test. *Krzewinski*, 338 F. Supp. at 498; *Hunter*, 49 Ohio App. 2d at 200, 360 N.E.2d at 717. Both cases recognized the inherent difference between police officers and other municipal employees, and that their very presence in the community during even their off-duty hours may be an important element of their police function. *Krzewinski*, 338 F. Supp. at 500; *Hunter*, 49 Ohio App. 2d at 199–200, 360 N.E.2d at 717; *see Detroit Police Officers Ass'n.*, 385 Mich. at 522–23, 190 N.W.2d at 97–98 (job of "policeman does have 'natural distinguishing characteristics' from all other city employees"); *Carofano*, 196 Conn. at 643, 495 A.2d at 1021 (decided on rational basis test, but court noted that even if a higher standard were appropriate, the interests of the municipality in imposing a residency requirement for police officers in particular far outweighed asserted interest of officers).

The town contends that the residency requirement is necessary to ensure adequate police protection, and suggests several reasons why Seabrook needs particularly prompt emergency response: the existence of a nuclear power plant, a greyhound racing track, a resident beach population in an area accessible only by bridge, and a town

population that doubles in the summer months. The town also contended below that the intermingling of the police officers during off-duty hours with the public is important — it gives the officers both a better understanding of the town atmosphere and a better knowledge of its inhabitants, both of which the town believes would act as a deterrent to crime. These benefits might not exist if the town's police force lived elsewhere.

The association argues that the town has not had problems with police response to emergencies thus far. This argument, however, misses the mark. A town may be prompted to require residency of its police officers by concerns other than rare major emergencies in which these officers report in to the station before going to duty areas. Thus, an officer's emergency response time is not governed merely by his proximity to the police station. A police officer physically present in a neighborhood can immediately respond to trouble: "[I]t is not the call from the station house but the chance observations of a neighbor or of the officer himself which will prompt [an officer's] off-duty actions." *Krzewinski*, 338 F. Supp. at 500.

Moreover, should there be a grave emergency in Seabrook, whether related to nuclear power, the weather, or some other unforeseen event, police officers living in town may very well be able to reach the police station or other emergency positions within the town more readily than those having to travel into town on roads congested by frightened motorists fleeing from danger. As noted above, the mere ability of a police officer to respond to the station is not the only public concern. Also included might be the ability of the resident officer to instill some sense of calm and direction amongst his frightened neighbors, resulting in a more orderly and safer evacuation.

We hold that the town's residency requirement for police officers does not unduly or unreasonably restrict the officers' fundamental right to live where they choose. The association's argument that the town might possibly have found some other method of ensuring quick response time, such as the use of beepers, is inapposite in that such other methods do not fully achieve the town's ends. The use of beepers, for example, would not meet the need to have the police officers present in the community during their off-duty hours. Thus, we hold that the town may constitutionally require the police officers to live within its borders.

The association's claim that the town's residency requirement violates the police officers' rights to equal protection under the New Hampshire Constitution is equally without merit. Equal protection

requires that those who are similarly situated be treated similarly. *Gazzola v. Clements*, 120 N.H. 25, 29, 411 A.2d 147, 151 (1980). Equal protection, however, does not require complete equality in the face of factual differences. *Belkner v. Preston*, 115 N.H. 15, 17, 332 A.2d 168, 170 (1975); *see Campbell Marine Const., Inc. v. Town of Gilford*, 132 N.H. 495, 497, 567 A.2d 184, 185 (1989). The association argues that other members of various emergency response teams are not required to live within the boundaries of the town despite a similar need to respond quickly in an emergency; neither are the town manager nor the selectmen's administrative assistant so constrained despite their important roles in government. What this argument fails to recognize, however, is that the totality of the police officers' job differentiates them from these others who might on rare occasion need to respond to a major emergency. Police officers do have important emergency roles, but unlike others in the town, they must also respond to daily situations within the community. Moreover, as the town notes, police officers alone have the necessary police power to protect persons and property during an emergency situation. Thus, we find that a clear and reasonable distinction exists between the police officers and the other town employees sufficient to warrant disparate treatment with respect to residency requirements.

When a fundamental interest is involved, a second equal protection analysis must be utilized. Under this analysis, strict scrutiny is applied to require a compelling State interest in order to sustain the regulation. *Gazzola v. Clements*, 120 N.H. at 30, 411 A.2d at 152; *Belkner v. Preston*, 115 N.H. at 18, 332 A.2d at 170–71. As we already determined this issue in favor of the town under the earlier *Donnelly* analysis, we will not again address it here.

Accordingly, we hold that the charter requirement that the members of the Seabrook police force live within the borders of the town is constitutional.

*Affirmed.*

BROCK, C.J., and BATCHELDER, J., dissented; the others concurred.

BROCK, C.J., and BATCHELDER, J., dissenting: The fundamental right to travel guaranteed by the New Hampshire Constitution, *Donnelly v. Manchester*, 111 N.H. 50, 51, 274 A.2d 789, 791 (1971), may be impaired only upon a showing of a compelling State interest and that the regulation in question is reasonably related to its objective. We do not find that the record in this case shows that the town

has sustained its burden in that regard, and on the facts of this case find the requirement unduly restrictive of a fundamental constitutional right. Emergency response, which no one will dispute is a valid concern with respect to police and firefighting personnel, may in some cases require a time and distance, but not a geographic, condition of employment.