Rockingham
No. 97-894

WILLIAM D. MCDILL

v.

ENVIRONAMICS CORPORATION

February 3, 2000

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*Christopher E. Grant* on the brief and orally), for the plaintiff.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Portsmouth (*David Wolowitz & a.* on the brief, and *Mr. Wolowitz* orally), for the defendant.

*Bossie, Kelly, Hodes & Buckley, P.A.*, of Manchester (*Heather M. Burns* on the brief), and *Moquin & Daley, P.A.*, of Manchester (*Joni N. Esperian* on the brief), for the New Hampshire Chapter of the National Employment Lawyers Association, as *amicus curiae*.

*New England Legal Foundation*, of Boston, Massachusetts (*Loretta M. Smith* on the brief), and *Rath, Young & Pignatelli, P.A.*, of Concord (*Andrew W. Serell* on the brief), for the Business and Industry Association of New Hampshire, as *amicus curiae*.

JOHNSON, J. The defendant, Environamics Corporation, appeals a jury verdict from the Superior Court (*McHugh*, J.) awarding the plaintiff, William D. McDill, $65,000 in damages on his breach of contract claim. We reverse and remand.

Based on evidence introduced at trial, the jury could have found the following facts. The plaintiff was hired by the defendant as its controller on July 12, 1993. His contract provided that he could be dismissed only "for cause." The defendant's president, Robert Rockwood, hired the plaintiff's daughter, Kelly McDill, for the summer of 1994 before she began college. Rockwood had sole authority to hire or fire employees.

At a company marketing event, an official from the defendant's parent company met Kelly. The official informed Rockwood that he advised against hiring children of management. Although the official wanted Kelly terminated, Rockwood did not do so because he had made a commitment to her for the summer, which was nearly over. Rockwood believed that Kelly's employment was only for the

summer. Shortly thereafter, Rockwood advised the plaintiff about the company official's concern.

A marketing department employee communicated with Kelly that fall about her availability during her winter academic break. Once in December 1994, and from January 3 to January 12, 1995, Kelly worked in the marketing department for this employee under the supervision of one of the defendant's other managers.

While working late on the evening of January 10, 1995, the plaintiff saw a facsimile transmission from an applicant for his job (the facsimile) as it printed out on the machine in a common area. Believing that the defendant was planning on finding an excuse to terminate him, the plaintiff made a copy of the facsimile. He planned on discussing the facsimile with Rockwood, but Rockwood's secretary told the plaintiff that Rockwood had asked whether she had seen the facsimile and advised her not to discuss it with anyone. The plaintiff decided not to approach Rockwood on the matter. Until trial, the defendant did not know that the plaintiff had copied the facsimile.

Rockwood first became aware that Kelly had returned to work on January 12, 1995. He decided to "have Kelly let go from the company." Upon receiving notice that day, the plaintiff immediately terminated his daughter. Kelly McDill testified that her father "had to let me go . . . because I was his daughter." Rockwood testified that he advised all managers, including the plaintiff, against hiring relatives, and there was evidence that other managers in the company knew of this prohibition. This policy was never reduced to writing, however, and Rockwood's testimony was the only evidence that the plaintiff had ever been advised of this rule. The plaintiff testified that he was never advised of this prohibition. Further, he testified that his daughter was not "rehired" because she had not been terminated after the summer of 1994, and because she was brought back at the request of and under the direction of a different supervisor. He further testified that he did not place her on the payroll because she was already on the payroll from working the previous summer.

On February 13, 1995, Rockwood terminated the plaintiff's employment. In a letter given to the plaintiff, Rockwood stated the sole reason for termination: "As a result of your direct and willful act of insubordination by disregarding my express order prohibiting employment by the Company of your daughter, Kelly McDill, and the ensuing conflict of interest, your employment at Environamics Corporation is being terminated effective February 13, 1995." The plaintiff then filed suit claiming, *inter alia*, breach of contract.

During discovery, the plaintiff propounded an interrogatory asking the defendant to "state in full and complete detail all reasons for which the Plaintiff was terminated by you from his employment with you, giving the dates on which each such reason was stated to the Plaintiff." The defendant responded:

> In early January 1995, Mr. Rockwood discovered that Mr. McDill had placed his daughter, Kelly McDill, on Environamics' payroll. Mr. McDill's action was in direct violation of an express order that his daughter, Kelly McDill, not be placed on . . . Environamics' payroll. In addition, Mr. McDill did not have authority to hire employees. Mr. Rockwood always exercised that responsibility with the consultation of others, but that authority was never delegated to others. These actions constituted a serious breach of trust, conflict of interest and violation of contractual and fiduciary duties.

The plaintiff also asked the defendant to "identify all persons from whom applications and inquiries were received by you for the Plaintiff's position with you during the years 1994 and 1995" and then requested any documents or applications submitted. The defendant did not provide a copy of the facsimile to the plaintiff, or identify this particular applicant. The plaintiff also asked the defendant for "All documents relating to and including any and all forms of application and employment submissions and inquiries for the position of Controller with you, received by you during the years 1994 and 1995." In response, the defendant identified only the resume and facsimile cover sheet of the applicant who ultimately replaced the plaintiff, and stated that "there are no other documents relative to Environamics' attempts to engage a replacement for the Plaintiff."

The defendant asked the plaintiff to produce "Any and all 'Confidential Information' . . . which is [in] the possession of the Plaintiff." "Confidential [i]nformation" included, *inter alia*, "any information pertaining to the Company's affairs or interests which the Company does not make available to the public." The plaintiff responded that he did not possess any such documentation.

On direct examination, Rockwood testified that the only reason he fired the plaintiff was because on January 12, 1995, he learned that Kelly was working at the company again. Rockwood also testified that until this incident, he had never thought about terminating the plaintiff. The plaintiff questioned Rockwood about applicants for his position and the materials provided in discovery, including a copy of

Rockwood's schedule book, which contained information about the applicant who submitted the facsimile, and at least one other applicant. The plaintiff then introduced the facsimile, and asked Rockwood why an applicant would be seeking his position on January 10th.

The court admitted the facsimile and permitted the defendant to inquire into how it came into the plaintiff's possession. After extensive cross-examination, the plaintiff ultimately testified that if Rockwood knew he had copied the facsimile, he could have been fired.

The defendant then sought to examine Rockwood as to whether he would have fired the plaintiff for this act. Rockwood testified that copying the facsimile was "just a further breach of my faith and trust in him; that to take my personal mail, I just can't believe it." The trial court stopped the examination and held a conference in chambers.

During the conference, the trial court ruled that the defendant was precluded from introducing Rockwood's proffered testimony that copying the facsimile "would be a violation or breach of trust and that might even be a further reason for termination." The trial court concluded that "after-acquired evidence" was not relevant to damages in this case because the defendant did not learn of the plaintiff's conduct until trial, and therefore the defendant's discovery that the plaintiff had copied the facsimile would not mitigate damages. *Cf. McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362 (1995) (after-acquired evidence relevant to mitigate damages after date of discovery). The court also ruled that the plaintiff's actions were not relevant to the issue of the defendant's liability. The court reasoned that

> because the company stands firm in its position that the reason for the termination was the alleged rehiring of Kelly, that's what the employee is told, the employee brings a suit and that's what this case is all about, this other extraneous, speculative information really should not become a part of this litigation. So that's why I instructed the witness not to address this issue of what other bad things did Mr. McDill do and maybe had the Kelly situation not come up would you have fired him anyway. I don't think that's appropriate questioning or evidence given the parameters that this lawsuit sets forth.

The plaintiff conceded on cross-examination, however, that it was inappropriate to "take proprietary information, private correspon-

dence, from within a company and not disclose it to the individual, who happens to be the CEO of the company, . . . for personal purposes." At the conclusion of trial, the jury found that the plaintiff had been fired without good cause and awarded damages of $65,000. This appeal followed.

On appeal, the defendant asserts that the trial court erred: (1) in its determination that after-acquired evidence of the plaintiff's wrongdoing was irrelevant; and (2) failing to give a curative jury instruction after the plaintiff's closing.

■ The defendant contends that the trial court erred as a matter of law in failing to permit introduction of the after-acquired evidence and in concluding that such evidence was irrelevant to the issues of liability and damages. Whether after-acquired evidence may limit damages or completely bar liability is a question of law reviewable *de novo* by this court. *Cf. Byblos Corp. v. Salem Farm Realty Trust*, 141 N.H. 726, 729, 692 A.2d 514, 516 (1997) (legal questions reviewed *de novo*). To the extent that we must review the trial court's decision to exclude Rockwood's testimony on an evidentiary basis, the proper standard is whether the trial court abused its discretion. *See Bohan v. Ritzo*, 141 N.H. 210, 217, 679 A.2d 597, 602 (1996).

. Although we have recognized that after-acquired evidence may be used to preclude a wrongfully terminated employee from gaining reinstatement, *see Appeal of N.H. Dept. of Employment Security*, 140 N.H. 703, 712, 672 A.2d 697, 703 (1996), the application of the doctrine as a limit to damages and liability presents a question of first impression. Because the case at bar involves termination for cause, we address only the propriety of applying the after-acquired evidence doctrine in cases that do not involve terminations that violate public policy, such as discrimination or retaliatory discharge. *Cf. McKennon*, 513 U.S. at 356 (applying doctrine in an age discrimination case).

■■ Some jurisdictions permit after-acquired evidence to serve as a complete bar to an employee's recovery, while other jurisdictions apply the after-acquired evidence doctrine only to mitigate an employee's damages. *See generally* Annotation, *After-Acquired Evidence*, 34 A.L.R.5TH 699 (1995). The defendant urges us to adopt the after-acquired evidence doctrine in both contexts. We first address the issue of whether after-acquired evidence can act as a complete bar to liability in a breach of contract action. A number of jurisdictions have concluded that a complete bar is appropriate under well-established principles of contract law because the prior

misconduct of the employee excuses the employer's subsequent breach. *See O'Day v. McDonnell Douglas Helicopter Co.*, 959 P.2d 792, 795 (Ariz. 1998). Courts adopting this doctrine have employed a three-prong test that requires the employer to show that: "(1) The plaintiff was guilty of some misconduct of which the employer was unaware; (2) the misconduct would have justified discharge; and (3) if the employer had known of the misconduct, the employer would have discharged the plaintiff." *Gassmann v. Evangelical Luth. Good Sam.*, 933 P.2d 743, 745 (Kan. 1997) (quotation omitted). We agree that in a breach of contract action "after-acquired evidence of employee misconduct is a defense to a breach of contract action for wages and benefits lost as a result of discharge if the employer can demonstrate that it would have fired the employee had it known of the misconduct." *O'Day*, 959 P.2d at 799. Furthermore, contract principles dictate that an employer may be permitted to use after-acquired evidence as a complete bar if it can prove that the employee's wrongdoing, such as resume or application fraud, "undermined the very basis upon which [the employee] was hired." *Crawford Rehab. Services v. Weissman*, 938 P.2d 540, 549 (Colo. 1997).

■ This does not mean, however, that after-acquired evidence of an employee's misconduct is always a complete bar to recovery. In wrongful termination tort cases, many jurisdictions apply the after-acquired evidence doctrine only to mitigate an employee's damages. *See, e.g., O'Day*, 959 P.2d at 797. The doctrine is used to limit the employee's damages to the time between the wrongful termination and the time the employer discovers the misconduct, provided the fact finder concludes that the employee's misconduct was sufficient to terminate the employee. *See, e.g., McKennon*, 513 U.S. at 362-63. We believe this approach is appropriate in tort cases because it properly balances the employee's entitlement to a remedy as a result of the employer's tortious conduct with an employer's interest in lawfully managing its business affairs. *See O'Day*, 959 P.2d at 797; *Camp v. Jeffer, Mangels, Butler, Marmaro*, 41 Cal. Rptr. 2d 329, 337 (Ct. App. 1995).

Having set forth the proper standards for the use of after-acquired evidence, we consider whether the trial court properly excluded the after-acquired evidence and properly precluded the defendant from asserting that the plaintiff's wrongdoing constituted a complete bar to liability. Here, the trial court excluded the evidence on the basis that it was "speculative" and not within the parameters of the litigation. Although a trial court, in its

gatekeeping function, may properly exclude unduly speculative evidence, *see* N.H. R. EV. 104(a), in this case the trial court improperly applied the after-acquired evidence doctrine. Specifically, it ignored the fact that after-acquired evidence, by its nature, changes the parameters of the litigation because it involves evidence discovered after the initial termination that gave rise to the litigation. Thus, we reverse and remand.

█ Further, we find that the court's error was not harmless. "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment will not be disturbed." *Welch v. Gonic Realty Trust Co.*, 128 N.H. 532, 537-38, 517 A.2d 808, 811 (1986) (quotation and ellipses omitted). Here, we cannot conclude that the court's treatment of the after-acquired evidence did not affect the outcome below. Because the cause of action was for breach of contract, the defendant was precluded from offering evidence of a complete defense to liability.

Accordingly, we reverse and remand for further proceedings. Given our disposition of this issue, we need not reach the defendant's remaining claim that the trial court erred in failing to provide a curative instruction.

*Reversed and remanded.*

JOHNSON, J., retired, sat by special assignment under RSA 490:3; all concurred.