Hillsborough County Probate Court
No. 2005-532

IN RE: CHRISTOPHER K.

Argued: October 11, 2006
Opinion Issued: April 17, 2007

*Bailinson, Capuchino & O'Leary,* of Manchester (*Linda Capuchino* on the brief and orally), for the petitioner.

*Disabilities Rights Center, Inc.,* of Concord (*Michael Skibbie* on the brief and orally), for the respondent.

*Kelly A. Ayotte,* attorney general (*Anthony I. Blenkinsop,* assistant attorney general, on the brief, and *K. Allen Brooks,* assistant attorney general, orally), for the State.

HICKS, J. The respondent, Christopher K., appeals an order of the Hillsborough County Probate Court (*Cloutier,* J.), renewing his order for involuntary admission to a receiving facility for the purposes of allowing him to remain on conditional discharge (renewal of conditional discharge) for a period of three years. *See* RSA 135-C:45, III (2005). We affirm.

The record supports the following facts. On May 7, 2002, following a hearing in the Merrimack County Probate Court, the respondent was involuntarily admitted to New Hampshire Hospital "for a period not to exceed 3 years with a conditional discharge as soon as appropriate." At some point, the respondent was conditionally discharged. According to the court-appointed psychiatrist in this proceeding, New Hampshire Hospital diagnosed the respondent at the time of his conditional discharge as having "Schizophrenia, in remission; Anxiety Disorder NOS; Depressive Disorder NOS; Polysubstance Abuse; and Antisocial personality traits." In May 2003, the respondent's conditional discharge was revoked because of his noncompliance with taking medication, threatening and/or assaulting behavior toward the staff of the Mental Health Center, and drug use to a degree that exacerbated his mental illness. Thereafter, the respondent was again conditionally discharged. On April 18, 2005, the petitioner, Richard Herron of the Mental Health Center of Greater Manchester, filed a petition to renew that conditional discharge. The court renewed the conditional discharge for a period of three years.

On appeal, the respondent argues that: (1) RSA 135-C:45, III violates the Due Process Clauses of the State and Federal Constitutions because it permits the involuntary admission of persons who are not currently

dangerous; (2) the probate court was prohibited from granting a renewal of the respondent's conditional discharge because his previous involuntary admission order had expired prior to the hearing date; (3) the probate court erred in not excluding the testimony of Dr. Albert Drukteinis, the court-appointed psychiatrist, because the respondent did not have the effective assistance of counsel before and during the court-ordered psychiatric evaluation; (4) the petition was not specific enough to satisfy RSA 135-C:36, I(b) (2005) or due process because the numerous allegations dating back several years failed to give notice of what the petitioner intended to prove at the hearing on the merits; and (5) the evidence was insufficient to establish current dangerousness.

The respondent first contends that RSA 135-C:45, III violates the State and Federal Due Process Clauses because it allows the involuntary admission of persons who are not currently dangerous. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. He argues: (1) that the statutory standard of proof for renewing a conditional discharge is lower than that for obtaining an initial involuntary admission, and does not require a finding of current dangerousness; and (2) that a finding of current dangerousness is nevertheless constitutionally required.

Regarding the first point, the State disputes that the renewal of a conditional discharge requires a lower standard of proof than the initial involuntary admission. We believe, however, that the respondent's argument actually relates to the elements that must be established for renewal of a conditional discharge, rather than the degree of certainty in the result. Thus, while the State found the respondent's claim unclear, and focuses its own brief upon procedural due process, we interpret the respondent's claim as a substantive due process challenge. Accordingly, we first examine the respective requirements for an initial involuntary admission and a renewal of a conditional discharge.

The standard for involuntary admission is set forth in RSA 135-C:34 (2005):

> The standard to be used by a court, physician, or psychiatrist in determining whether a person should be admitted to a receiving facility for treatment on an involuntary basis shall be whether the person is in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself or to others.

In addition, RSA 135-C:36, I(b) (2005) states that the petition for an involuntary admission shall include "[t]he specific acts or actions that the petitioner alleges satisfy RSA 135-C:34." Thus, although "commitment will not be ordered without proof of specific acts or actions demonstrating

dangerousness," *In re Fasi, a/k/a Cass*, 132 N.H. 478, 484 (1989), "acts which demonstrate the mental condition ... are not the focus of the inquiry, but are merely evidence bearing on the issue of dangerousness." *In re Field*, 120 N.H. 206, 209 (1980) (decided under prior law). "[T]he proceeding itself focuses on the present mental condition of the petitionee, and the propensity of the petitionee to commit future dangerous acts." *In re Fasi*, 132 N.H. at 483.

We have never imposed a particular time limit on the specific act requirement. Rather, we have said that "what is sufficiently recent will depend on the nature and circumstances of the act, the history of the person in question and the probative force of the other evidence adduced to prove dangerous propensity." *Id.* at 485 (quotations omitted).

■ Conditional discharge is provided for in RSA 135-C:45 (2005). Section II provides, in part:

> Admission for purposes of conditional discharge shall be appropriate when the person has recovered from his mental illness to such an extent that he no longer requires inpatient treatment but a prescribed regimen of medical, psychiatric, or psychological care or treatment is necessary to prevent the recurrence of the circumstances which led to the person's dangerous condition.

We recently noted in *In the Matter of B.T.*, 153 N.H. 255, 260 (2006), that "[t]he plain language of this statute requires that an order of admission precede an allowance for conditional discharge. Thus, the statutory scheme creates a two-step process for an admission for the purposes of conditional discharge." For this reason, the standard provided in RSA 135-C:34 for an involuntary admission must also be met. *Id.*

■ A conditional discharge may be renewed pursuant to RSA 135-C:45, III. The court may "order involuntary admission to a receiving facility, or renew such an order, for the purpose of permitting the respondent to remain on conditional discharge if such treatment is necessary to prevent the recurrence of the circumstances which led to the person's dangerous condition." *Id.* We interpret "dangerous condition" to refer back to the language of RSA 135-C:34: "such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself or to others." RSA 135-C:34. Thus, we read RSA 135-C:45, III in light of RSA 135-C:34 to require proof that a respondent in a conditional discharge renewal proceeding is currently in such condition, as a result of mental illness, that "a prescribed regimen of medical, psychiatric, or psychological care or treatment is necessary to prevent," RSA 135-C:45, II, "a

potentially serious likelihood of danger to himself or to others," RSA 135-C:34.

We have not yet had occasion to address whether the specific act requirement of RSA 135-C:36, I(b) applies to a petition to renew a conditional discharge under RSA 135-C:45, III. Regarding prior law, however, we noted in *State v. Hudson*, 119 N.H. 963 (1979), that the specific act requirement of RSA 135-B:28 (repealed 1986) "relates to the original commitment only. Renewal orders need not be based on specific acts, because commitment may be based on a pattern of prior action and testimony relating to the question whether or not any cure for the defendant's condition has been effected." *Id.* at 967.

We reach the same conclusion here. In authorizing involuntary admissions under RSA 135-C:45, I, the legislature clearly intended that the admitted person receive treatment for his mental illness. *See, e.g.*, RSA 135-C:40, II (requiring court-appointed psychiatrist to determine whether involuntary admission is necessary for treatment of the person). In addition, the legislature contemplated that inpatient admission provide the degree of security needed for the person. *See* RSA 135-C:40, IV (2005). Thus, the legislature was presumably aware that there should be few specific dangerous acts committed during the time a person is involuntarily admitted to a receiving facility, due to restrictions on the person's activities, successful treatment, or both.

A person on conditional discharge should be even less likely to commit a dangerous act, as long as he complies with the prescribed treatment regimen. Under the standard of RSA 135-C:45, II, a person on conditional discharge should have "recovered from his mental illness to such an extent that he no longer requires inpatient treatment." In other words, because a person on conditional discharge no longer requires the secure custodial function of an inpatient facility, he is presumably less likely to commit a dangerous act while he is in compliance.

■ Given this statutory framework, we believe the legislature could not have intended to impose upon a petitioner seeking to renew the conditional discharge of another the task of alleging and proving an additional recent dangerous act, as it would defeat the evident purpose of the statute. *See Weare Land Use Assoc. v. Town of Weare*, 153 N.H. 510, 511-12 (2006) (legislature will not be presumed to enact legislation "nullifying, to an appreciable extent, the purpose of the statute"); *cf. In re Guardianship of E.L.*, 154 N.H. 292, 301 (2006) (requiring guardian to prove continued incapacity of ward solely upon acts, occurrences or statements within six months of termination motion would lead to absurd result). Thus, we hold that there is no additional "specific act requirement" for the renewal of an

involuntary admission for the purpose of continuing a conditional discharge under RSA 135-C:45, III, or, to use the terms respondent employs in his argument, the statute does not require proof of "current dangerousness" in the sense of a recent dangerous act.

Having interpreted the statute, we now address the respondent's argument that it violates due process. We first address his claims under our State Constitution, and cite federal opinions for guidance only. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

The respondent asserts that "there are significant liberty interests at stake." In particular, he contends that because a person on conditional discharge can have his discharge revoked, "[t]his kind of commitment, though in the first instance to a relatively unrestricted setting, carries with it a very real danger of institutionalization without further judicial action." *See* RSA 135-C:51 (2005) (Revocation of Conditional Discharge). Given the liberty interests asserted, we will assume, without deciding, that a strict scrutiny standard applies. *See In re Linehan*, 594 N.W.2d 867, 872 (Minn.) (noting that standard for determining whether civil commitment law violates substantive due process is strict scrutiny), *cert. denied*, 528 U.S. 1049 (1999).

Under our state strict scrutiny test, a statute's infringement upon a fundamental right will pass constitutional muster if it is "necessary to achieve a compelling State interest" and is "neither unduly restrictive nor unreasonable." *Seabrook Police Assoc. v. Town of Seabrook*, 138 N.H. 177, 179 (1993). We have noted that the latter prong of our state test is "similar to the federal 'narrowly tailored' requirement." *Id.*

■ Accordingly, we first examine the State's interest. The United States Supreme Court has recognized the following state interests in civil commitment:

> The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

*Addington v. Texas*, 441 U.S. 418, 426 (1979). We have noted similar state interests in the closely related situation of administering compulsory medical or psychiatric treatment to persons involuntarily admitted on an emergency basis. *See Opinion of the Justices*, 123 N.H. 554, 560-61 (1983). We have little trouble concluding that these interests are compelling. *Cf. In re Linehan*, 594 N.W.2d at 872 (concluding, in examining law providing for civil commitment of sexually dangerous persons, that "[s]tates have a

compelling interest in both protecting the public from ... violence and rehabilitating the mentally ill").

We now examine whether the statutory restriction is necessary to achieve the State's compelling interest and "neither unduly restrictive nor unreasonable." *Seabrook Police Assoc.*, 138 N.H. at 179. Looking to federal law for guidance, we note that the United States Supreme Court has "sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as 'mental illness' or 'mental abnormality.'" *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997). Although the Court's discussion was not couched in the federal strict scrutiny terms of narrow tailoring, we believe its analysis can be so applied. *Cf. id.* (explaining that "[t]hese added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control").

The respondent does not quarrel in general with an analysis using findings of mental illness and dangerousness to confine involuntary admissions to constitutional limits. Rather, his constitutional challenge focuses upon the more specific meaning of dangerousness. He contends that before a person may be "subject[ed] to all of the deprivations of involuntary hospitalization," a "judicial finding of current dangerousness" is "constitutionally required." He further asserts:

> Involuntary commitment cannot be permitted based on a finding of dangerousness at some time in the past or on a concern that the person will become dangerous in the future, for "keeping [an individual] against his will in a mental institution is improper absent a determination in civil commitment proceedings of *current* mental illness and dangerousness."

(Quoting *Foucha v. Louisiana*, 504 U.S. 71, 78 (1992) (emphasis added by respondent)).

The respondent's reliance upon *Foucha* is misplaced. *Foucha* challenged a Louisiana commitment scheme in which a criminal defendant found not guilty by reason of insanity would be committed to a psychiatric hospital "unless he proves that he is not dangerous[,] ... whether or not he is then insane." *Foucha*, 504 U.S. at 73. The question in *Foucha* was whether the defendant could, consistently with the constitution, be confined in a psychiatric hospital where "according to the testimony given at the hearing in the trial court, Foucha [wa]s not suffering from a mental disease or illness." *Id.* at 79. Thus, the issue in *Foucha* was not whether the defendant was currently dangerous, but whether he was currently mentally ill.

■ Looking to *Hendricks* for guidance, we conclude that due process under our State Constitution is not violated by the renewal of a conditional discharge based upon a finding of dangerousness in the past and a finding that the person, because of mental illness, poses a potentially serious likelihood of danger in the future. In *Hendricks*, the United States Supreme Court upheld, against several federal constitutional challenges including substantive due process, the Kansas Sexually Violent Predator Act, a civil commitment statute. *Hendricks*, 521 U.S. at 350-51, 356. The *Hendricks* Court noted that the statute "requires proof of more than a mere predisposition to violence; rather, it requires evidence of *past* sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the *future* if the person is not incapacitated." *Id.* at 357 (emphasis added). RSA 135-C:45, III also "requires proof of more than a mere predisposition to violence." *Hendricks*, 521 U.S. at 357. Having previously been involuntarily admitted, the respondent in a conditional discharge renewal proceeding will have had a past dangerous act or acts proved against him. *Cf. id.* (Sexually Violent Predator Act at issue required evidence of past sexually violent behavior where "[c]ommitment proceedings can be initiated only when a person 'has been convicted of or charged with a sexually violent offense.'").

■ The *Hendricks* Court also noted that the Kansas statute met the constitutional requirement of coupling proof of dangerousness with proof of an additional factor such as mental illness: "It requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Id.* at 358. We have interpreted RSA 135-C:45, III to require proof that a respondent in a conditional discharge renewal proceeding is currently in such condition, as a result of mental illness, that "a prescribed regimen of medical, psychiatric, or psychological care or treatment is necessary to prevent," RSA 135-C:45, II, "a potentially serious likelihood of danger to himself or to others," RSA 135-C:34. We conclude that this standard appropriately links a finding of future dangerousness to the existence of a mental illness that, without the prescribed treatment, would make it difficult if not impossible for the person to control his or her behavior. We therefore conclude that RSA 135-C:45, III's restrictions upon fundamental liberty are no "greater than necessary to effectuate the [State's] legitimate objective[s]," *Seabrook Police Assoc.*, 138 N.H. at 179 (quotations omitted), and that the statute therefore satisfies substantive due process standards under our State Constitution.

The State Constitution provides at least as much protection as the Federal Constitution under these circumstances. *See Hendricks*, 521 U.S. at 357-58. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

The respondent next argues that the probate court could not renew his conditional discharge because his previous involuntary admission order had expired prior to the hearing date. RSA 135-C:45, III provides:

> If the respondent is on a conditional discharge at the time of the hearing, the court may order involuntary admission to a receiving facility, or renew such an order, for the purpose of permitting the respondent to remain on conditional discharge if such treatment is necessary to prevent the recurrence of the circumstances which led to the person's dangerous condition.

The respondent's involuntary admission, and therefore his conditional discharge, was set to expire on May 6, 2005. The petition to renew was filed on April 18, 2005, and the court scheduled a hearing for May 4, prior to the expiration of the respondent's conditional discharge. The respondent filed a motion to reschedule, explaining that his appointed counsel had been ineffective and that he had retained new counsel who required additional time to prepare for the hearing. He requested that the hearing be rescheduled to May 9, 2005. The hearing was actually held on May 24.

The respondent argues that because the petition to renew was filed prior to the expiration of the initial period of involuntary admission, that period of involuntary admission was "arguably" extended pursuant to RSA 135-C:39, II (2005), which provides:

> A period of involuntary admission ordered by a probate court pursuant to RSA 135-C:45 may be continued under subparagraph I (c), provided that a petition requesting a judicial hearing on the issue of a subsequent involuntary admission has been filed with the appropriate probate court within the initial period of involuntary admission. Upon the filing of the petition, the period of involuntary admission may be extended until the issuance of the order of the probate court pursuant to RSA 135-C:45; provided that the probate court shall act upon the petition within 30 days of its filing.

The respondent further contends, however, that under this provision, the thirty-day extension on the order for involuntary admission expired on May 18, 2005, and, therefore, the order "was not in effect on May 24, 2005, the day of the hearing on the petition." He concludes:

> By operation of RSA 135-C:39, II, the previous order of involuntary admission period had expired by the time the probate court acted on the petition. Because the Court could not, by virtue of RSA 135-C:45, III, extend respondent's previous order of involuntary admission, its order granting that extension is void for lack of jurisdiction.

Because we disagree with the respondent's interpretation and application of RSA 135-C:39, II, we reject his argument.

We must first determine whether RSA 135-C:39, II's instruction that the court act within thirty days is mandatory or directory. *See In re Robyn W.*, 124 N.H. 377, 379 (1983). Our task is to "determine the intent of the legislature in enacting the statute." *Id.* We start by examining the language of the statute itself, ascribing to the words used their plain and ordinary meaning. *See id.*

"The general rule of statutory construction is that the word 'shall' is a command which requires mandatory enforcement." *Id.* Thus, we consider the thirty-day time limitation to be mandatory. *See id.* at 380. This does not end the inquiry, however, for "we must next determine the appropriate mode of enforcement of the mandate." *Id.* RSA 135-C:39, II does not provide a remedy for the court's failure to act within thirty days of the filing of the petition. Accordingly, we look to the statutory goals to determine whether terminating the extension of the period of involuntary admission is the appropriate mode of enforcing the statute's mandate. *See Smith v. N.H. Bd. of Psychologists*, 138 N.H. 548, 551 (1994); *see also In re Robyn W.*, 124 N.H. at 381.

■ The purpose of RSA chapter 135-C is "to enable the department of health and human services to:"

> (a) Establish, maintain, and coordinate a comprehensive, effective, and efficient system of services for persons with mental illness.
> (b) Reduce the occurrence, severity and duration of mental, emotional, and behavioral disabilities.
> (c) Prevent mentally ill persons from harming themselves or others.

RSA 135-C:1, I (2005). Thus, RSA chapter 135-C is aimed at both treating and protecting mentally ill persons and at protecting the public from mentally ill persons who are dangerous.

■ To interpret RSA 135-C:39, II so that the extension of the period of involuntary admission terminates at the end of the thirty-day period,

notwithstanding that the probate court's failure to act within that period was for good cause (such as here, where the respondent moved for a continuance), would thwart both purposes of RSA chapter 135-C: treatment of the respondent and protection of the public. Such an interpretation could leave a person without needed treatment or cause the release of a dangerous person into the general population. The legislature could not have intended such a result. *See Weare Land Use Assoc.*, 153 N.H. at 511; *see also People v. Williams*, 92 Cal. Rptr. 2d 1, 12 (Ct. App. 1999) (concluding that violation of deadline for commencing involuntary commitment trial did not deprive the trial court of jurisdiction where such result "would, in effect, automatically terminate [a mentally disordered offender's] involuntary treatment, regardless of need, and require his or her release, regardless of the potential danger to others," a result "inconsistent with the purpose of the [Mentally Disordered Prisoners Act]").

As we stated in *In re Robyn W.*:

> We find that the various interests may be promoted and reconciled only by treating the statutory mandate as one directed to this court in its supervisory role. RSA 490:4. We will enforce the time limitation under this statute by entertaining complaints against a dilatory judge, whether raised by appeal or by petition addressed to our original jurisdiction, unless non-compliance is *de minimis*.

*In re Robyn W.*, 124 N.H. at 381.

Under RSA 135-C:39, II, as here interpreted, the extension of the respondent's involuntary admission, and thus his conditional discharge, did not automatically terminate at the end of the thirty-day period. Thus, the respondent was still "on a conditional discharge at the time of the hearing" on May 24, 2005. RSA 135-C:45, III. Accordingly, we reject the respondent's argument that the probate court lacked jurisdiction to renew his conditional discharge.

The respondent next contends that because he was without the effective assistance of counsel before and during the court-ordered psychiatric evaluation, the probate court should have excluded the testimony of Dr. Drukteinis. We review the trial court's decision on the exclusion of testimony for an unsustainable exercise of discretion. *See McDill v. Environamics Corp.*, 144 N.H. 635, 640 (2000); *State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). The respondent asserts that his prior counsel, who had been appointed by the court, failed to prepare him for the evaluation and failed to request a

record of the evaluation for later preparation for cross-examination at the hearing on the merits. He then argues, without legal citation, that "[t]he proper remedy for counsel's failure to provide respondent with effective representation was to strike the evaluation which was conducted without counsel's assistance."

Pursuant to RSA 135-C:22 (2005), "[t]he right of a client or a person sought to be admitted to a program or facility to legal counsel prior to and during any judicial hearing conducted under this chapter shall be absolute and unconditional." We have never discussed whether a right to the effective assistance of counsel exists in the context of involuntary commitments, or what the remedy for ineffective assistance might be. *Cf. In re Field*, 120 N.H. at 210 (observing, in holding that person sought to be involuntarily admitted had no Sixth Amendment right to presence of counsel at psychiatric examination, that "examinee was not foreclosed from effective assistance of counsel"). Assuming, however, without deciding, that the criminal standard would apply: "A successful claim of ineffective assistance of counsel must demonstrate that counsel's representation was constitutionally deficient and actually prejudiced the outcome of the case. The level of actual prejudice must be such that there is a reasonable probability that the result of the proceeding would have been different." *State v. Walton*, 146 N.H. 316, 318 (2001) (quotations, citation and ellipses omitted).

The respondent first contends that "no showing of actual prejudice should be required when, as in this case, there has been a complete lack of representation provided at a critical phase of the proceedings." The respondent cites no authority for a presumption of prejudice from a lack of representation. In fact, the analysis proceeds in the opposite direction: "If the [respondent] is unable to demonstrate . . . prejudice, we need not even decide whether counsel's performance was deficient." *Id.* Thus, we now consider whether the respondent demonstrated prejudice.

He argues that the assistance of counsel prior to the evaluation "may have been significant, for it appears respondent was poorly prepared to provide relevant information" and "[o]ther information available to the examiner was either of doubtful reliability or not thoroughly examined." In particular, the respondent points out, Dr. Drukteinis took information from the petition, which the petitioner, when cross-examined at the hearing, admitted contained portions that could be misleading.

The respondent has failed to demonstrate "a reasonable probability that the result of the proceeding would have been different," *id.* at 318 (quotation and ellipsis omitted), had his prior counsel prepared him for the evaluation. Even if the respondent was unable to provide Dr. Drukteinis

with a detailed history, the respondent has not demonstrated on appeal that there existed any specific fact not known by Dr. Drukteinis that might have changed his opinion. Moreover, even if some information Dr. Drukteinis may have used to fill in gaps was misleading, replacement counsel pointed out the misleading representations during his cross-examination of the petitioner, which Dr. Drukteinis observed prior to giving his own testimony. Thus, we affirm the probate court's implicit finding that the respondent's ineffective legal assistance claim fails and we need not consider whether the exclusion of evidence is an appropriate remedy in such cases. Accordingly, we cannot find that the trial court committed an unsustainable exercise of discretion in admitting Dr. Drukteinis' testimony.

The respondent next argues that the petition was not specific enough to give notice of what the petitioner intended to prove at the hearing on the merits, and therefore violated RSA 135-C:36, I(b) and the Federal and State Due Process Clauses. Noting that the petition included more than twenty-five dated allegations going back to November 2000 and a dozen undated allegations of dangerous behavior, the respondent argues:

> Due to the number of allegations, the span of years they covered, the failure to include sufficient information about their dates and context, their misleading nature, and the failure of the petitioner to even attempt to prove the majority of them, the petition failed to satisfy the basic requirements of due process and of RSA 135-C:36, I(b) . . . .

As noted previously, RSA 135-C:36, I(b) requires the petition for an involuntary admission to include "[t]he specific acts or actions that the petitioner alleges satisfy RSA 135-C:34." Because we have held that RSA 135-C:45, III does not require the allegation or proof of a recent "specific act" for the renewal of a conditional discharge, the allegations of specific acts in the petition are inconsequential.

Finally, the respondent argues that the order renewing his conditional discharge was not supported by sufficient evidence of dangerousness. "We will uphold the probate court's ruling unless no rational fact-finder could have made the findings by clear and convincing evidence." *In re Sandra H.*, 150 N.H. 634, 640 (2004).

The respondent first argues that the evidence was insufficient because "no substantive evidence was introduced about specific acts of dangerous behavior." Again, however, we held above that RSA 135-C:45, III does not require proof of a specific dangerous act. Thus, we reject this argument.

The respondent next contends that the evidence of his noncompliance with taking his medications was also insufficient to establish current

dangerousness. He asserts that "there was no actual testimony of noncompliance" and that the petitioner instead sought to rely upon the opinions and statements of non-testifying individuals. Nevertheless, he does not challenge on appeal the introduction of this evidence. Thus, for instance, he states, "Herron was permitted to testify, over a hearsay objection, that based on Herron's discussion with Dr. Carella, respondent's 'most recent position' about taking medication was '[t]hat he's going to stop taking them.[']" As he fails to appeal the court's ruling on his hearsay objection, the statement remains admitted and competent evidence as to the respondent's intentions with regard to taking his medications.

After reviewing the record, we cannot conclude that "no rational fact-finder could have made the findings by clear and convincing evidence" to support the renewal of conditional discharge. *Id.* at 640. Dr. Drukteinis testified that the respondent has a "chronic psychotic disorder" and that "[h]is psychosis . . . has been accompanied by violent type of behavior." He further testified that "[b]ecause the disorder that he has is chronic, if he were to become psychotic and paranoid again, there's a very high likelihood that it would sooner or later be accompanied by threatening or dangerous behavior, and therefore, in my opinion, he needs to have continued monitoring." Although Dr. Drukteinis was not able to form an opinion, based upon his own evaluation of the respondent, as to whether the respondent would discontinue taking medications, he was emphatic that if true, that would present "a very ominous situation," and "then I think we have to be very concerned to not have some sort of conditional discharge on him." Finally, Dr. Drukteinis was asked, "[I]f [the respondent] were to have said . . . as Mr. Herron testified, to his treating psychiatrist, Janet Carella, that he will absolutely stop taking his medication, would you deem that to be a danger today . . . ?" He responded: "I would believe that that's a very serious sign, and I think it does point to a potentially serious likelihood of danger." We find no error.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, J., concurred.